# United States Court of Appeals
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

———

Argued November 14, 2008　　　　Decided July 7, 2009

No. 07-1306

EXXON MOBIL CORPORATION,
PETITIONER

v.

FEDERAL ENERGY REGULATORY COMMISSION,
RESPONDENT

SOUTHERN COMPANY SERVICES, INC., ET AL.,
INTERVENORS

———

Consolidated with 07-1309, 07-1310, 07-1335, 07-1351

———

On Petitions for Review of Orders
of the Federal Energy Regulatory Commission

———

*Ashley C. Parrish* and *William R. Mapes Jr.* argued the causes for Generator Petitioners. With them on the briefs was *Neil L. Levy*. *Marc C. Johnson* entered an appearance.

*Scott B. Grover* argued the cause for Utility Petitioners. With him on the briefs were *S. Chris Still* and *Kevin A. McNamee*.

*Thomas D. Samford IV* was on the brief for intervenor Alabama Public Service Commission in support of Utility Petitioners.

*Samuel Soopper*, Attorney, Federal Energy Regulatory Commission, argued the cause for respondent. On the brief were *Cynthia A. Marlette*, General Counsel, *Robert H. Solomon*, Solicitor, and *Beth G. Pacella*, Senior Attorney.

*William R. Mapes Jr.*, *Neil L. Levy*, and *Ashley C. Parrish* were on the brief for Generator Intervenors.

*Joshua Z. Rokach*, *Erin M. Murphy*, *S. Chris Still*, and *Scott B. Grover* were on the brief for Utility Intervenors. *Lyle D. Larson* entered an appearance.

Before: SENTELLE, *Chief Judge*, GRIFFITH, *Circuit Judge*, and RANDOLPH, *Senior Circuit Judge*.

Opinion for the Court filed by *Circuit Judge* GRIFFITH.

GRIFFITH, *Circuit Judge*: Here we review the competing claims of six independent electric power generators and three public utility companies, each dissatisfied with the manner in which the Federal Energy Regulatory Commission resolved an unusual problem involving an application of its interconnection pricing policies. The Generators filed complaints with FERC, seeking to recover from several utilities funds paid to cover the cost to interconnect to the utilities' transmission systems. Arguing that these funds were a loan to improve the utilities' systems, the Generators sought a credit against charges for future transmission service. FERC agreed in part and awarded the Generators a partial refund in the form of credits. But the amount awarded was not enough, in the Generators' view, and they now ask us to review

FERC's decision. Three of the utility companies that would be required to issue the transmission credits are also dissatisfied with the outcome and likewise seek review, arguing FERC was without authority to award any credits. Because we find FERC's decision reasonable, we deny the Generators' petitions. We dismiss the Utilities' petitions because they lack standing.

## I.

We begin with a description of the context in which the parties' competing claims arise: a complex web of statutory provisions, regulations, agency and judicial precedent, and economic principles that is typical of federal energy law.

### *Statutory Background*

Section 201 of the Federal Power Act (FPA), 16 U.S.C. § 824(b) (2006), grants FERC exclusive jurisdiction over the transmission and sale of electric energy in interstate commerce. Section 205 requires every public utility to file with FERC a schedule that includes the rates charged to customers for the transmission or sale of energy. *Id.* § 824d(c). FERC must ensure the rates are "just and reasonable." *Id.* § 824d(a).

Once approved, there is only one way for FERC to revisit its determination that a rate is reasonable. Section 206(a) of the FPA requires FERC, upon its own motion or the filing of a complaint, to determine whether "any rate, charge, or classification . . . observed [or] charged . . . by any public utility for any transmission or sale . . . is unjust, unreasonable, unduly discriminatory or preferential." *Id.* § 824e(a). FERC must remedy such a rate by "determin[ing] the just and reasonable rate, charge, [or] classification . . . to be thereafter

observed and in force, and shall fix the same by order." *Id.* FERC may not retroactively alter a filed rate to compensate for prior over- or underpayments. *See Towns of Concord v. FERC*, 955 F.2d 67, 71 & n.2 (D.C. Cir. 1992). A corollary to this rule against retroactive ratemaking, the filed rate doctrine, "forbids a regulated entity to charge rates for its services other than those properly filed with the appropriate federal regulatory authority." *Ark. La. Gas Co. v. Hall*, 453 U.S. 571, 577 (1981). Together, these rules generally limit the relief FERC may order to prospective remedies. *See id.* at 578.

The FPA provides a narrow exception to the limitations imposed by these rules, under which FERC can order the refund of some past rate payments. Section 206(b) of the FPA permits FERC, when ordering prospective relief under section 206(a), to order "refunds of any amounts paid" in excess of the just and reasonable rate during a statutorily defined period. 16 U.S.C. § 824e(b). Today, this refund period begins at the latest five months after the filing of a complaint, and ends fifteen months later. *Id.* In short, FERC can order a refund of overcharges paid during a limited time period that begins after the filing of a complaint.

*Interconnection Pricing*

In what we have referred to as "the bad old days," *Midwest ISO Transmission Owners v. FERC*, 373 F.3d 1361, 1363 (D.C. Cir. 2004), public utilities owned most of the nation's electricity grid and there was little competition within wholesale electric energy markets, *id.* In exercising their monopoly power, these utilities refused independent electricity generators access to their transmission lines on competitive terms and conditions. *See Transmission Access Policy Study Group v. FERC*, 225 F.3d 677, 681–82 (D.C. Cir. 2000).

In its landmark Order No. 888, FERC did away with the old arrangement and sought to establish competitive wholesale power markets to increase consumer welfare. *See id.* at 680–81; *see also* Promoting Wholesale Competition Through Open Access Non-discriminatory Transmission Services by Public Utilities (Order No. 888), 61 Fed. Reg. 21,540 (May 10, 1996). To achieve this goal, Order No. 888 requires that public utilities provide open access to their transmission lines on nondiscriminatory terms to any independent entity that generates or purchases electricity. *Transmission Access*, 225 F.3d at 681.

To take advantage of open access, generators must be able to link their plants to the utilities' transmission systems. The process of physically connecting a generating plant to a transmission grid is called "interconnection." Although Order No. 888 did not address interconnection, FERC has since made clear that interconnection is an indispensable component of open access that must be offered on a nondiscriminatory basis. *See Tenn. Power Co.*, 90 F.E.R.C. ¶ 61,238, at 61,761–62 (2000).

The rates, terms, and conditions of interconnection are set forth in "interconnection agreements" between the utility that owns the transmission system and the interconnecting generator. These agreements identify the new facilities needed and what the generator must pay to achieve interconnection. The parties file their agreements with FERC for its certification that they are just and reasonable. *See Entergy Servs., Inc. v. FERC*, 391 F.3d 1240, 1243 (D.C. Cir. 2004). The agreement's rate for interconnection becomes a filed rate that can only be modified under the section 206 process.

FERC originally evaluated the cost allocations laid out in interconnection agreements on a case-by-case basis but over time found this approach inadequate. *See Nat'l Ass'n of Regulatory Util. Comm'rs v. FERC*, 475 F.3d 1277, 1279 (D.C. Cir. 2007). In Order No. 2003 and three successive rehearing orders, FERC standardized the method by which utilities must set their rates for interconnection. *See* Standardization of Generator Interconnection Agreements and Procedures (Order No. 2003), 68 Fed. Reg. 49,846 (Aug. 19, 2003). The pricing model FERC adopted recognizes that interconnection requires an initial cost outlay for two types of facilities. "Interconnection Facilities" are located before the point of interconnection and allow generators to connect to the transmission grid. "Network Upgrades" are located on the grid—that is, "at or beyond" the point of interconnection— and improve the network for the benefit of all users. *See id.* at 49,849; *see also Nat'l Ass'n*, 475 F.3d at 1284–85. The interconnecting generator pays up front for both sets of facilities. *See* Order No. 2003, 68 Fed. Reg. at 49,901; *Entergy*, 391 F.3d at 1243.

Placing the full cost of these new facilities on the generator alone, however, is unreasonable. *See* Order No. 2003, 68 Fed. Reg. at 49,849. Because Interconnection Facilities benefit only the interconnecting generator, the generator properly bears their full cost. *See id.* at 49,901. Network Upgrades, by contrast, improve the entire network, thus their cost must be spread among all users. *See id.*; *see also Entergy*, 391 F.3d at 1243. This distribution is achieved by assigning the cost of Network Upgrades to the utility whose network is improved. The utility rolls this cost into its transmission rates so that all users of the grid pay their fair share. Because an interconnecting generator pays up front for Network Upgrades, it would be unfair to make it pay again for those upgrades through increased transmission rates designed

to spread the cost of the upgrades among all beneficiaries of the improved service. The utility must therefore grant the interconnecting generator "transmission service credits" equal to the total cost of the Network Upgrades. The interconnecting generator uses its transmission service credits to offset future transmission charges paid to move power over the improved grid. *See* Order No. 2003, 68 Fed. Reg. at 49,849–50; *see also Entergy*, 391 F.3d at 1243.

In the typical case, assignment of transmission service credits is straightforward. If a newly created facility is classified as a Network Upgrade in an interconnection agreement, the generator receives a credit to apply against its transmission service charges. As one might expect, this case is not typical.

*Factual Background*

The Generators entered into interconnection agreements with utilities before FERC's interconnection pricing policies were settled. These agreements, accepted by FERC between 1999 and 2001, classified facilities located at or beyond the point of interconnection as Interconnection Facilities rather than Network Upgrades. The Generators were thus forced to bear the full cost associated with their construction and received no corresponding transmission service credits. *See, e.g.*, *ExxonMobil Corp. v. Entergy Servs., Inc.* (*Exxon Order*), 118 F.E.R.C. ¶ 61,032, at 61,171 (2007), *reh'g denied* (*Exxon Rehearing Order*), 119 F.E.R.C. ¶ 61,261 (2007).

After FERC's interconnection pricing policies were settled, the Generators filed complaints under section 206 of the FPA, arguing that the classification of these facilities as Interconnection Facilities was unjust and unreasonable. The Generators asked FERC to reclassify the facilities as Network

Upgrades and order the utilities to issue transmission service credits equal to the amount the Generators paid to fund their construction.

FERC granted the Generators' complaints in early 2007. The Commission had recently addressed a similar circumstance in *Duke Energy Hinds, LLC v. Entergy Services, Inc.* (*Duke Hinds II*), 102 F.E.R.C. ¶ 61,068 (2003), *reh'g denied* (*Duke Hinds III*), 117 F.E.R.C. ¶ 61,210 (2006), and applied this precedent to resolve many of the substantive issues raised by the Generators. In the *Duke Hinds* proceedings, FERC found that facilities located at or beyond the point of interconnection should be classified as Network Upgrades regardless of how they are characterized in an interconnection agreement. *See id.* at 61,172–73. Any interconnection agreement that improperly classifies a Network Upgrade must be corrected, and the generator that paid for the facility is entitled to transmission service credits. *See id.* Accordingly, FERC ordered that the Generators' interconnection agreements be revised and that they receive transmission service credits for the amount of their Network Upgrade payments. *See, e.g.*, *Tenaska Ala. II Partners, L.P. v. Ala. Power Co.* (*Tenaska Order*), 118 F.E.R.C. ¶ 61,037, at 61,193–94 (2007), *reh'g denied* (*Tenaska Rehearing Order*), 119 F.E.R.C. ¶ 61,315 (2007); *Exxon Order*, 118 F.E.R.C. at 61,172–73.

So far, so good for the Generators. The catch came with FERC's method for calculating the appropriate amount of transmission service credit owed to the Generators. FERC concluded that the refund limitations of section 206(b), together with the filed rate doctrine and the rule against retroactive ratemaking, prevented it from providing the Generators with the full credits they would have received had the facilities been properly classified at the outset. *See, e.g.*,

*Tenaska Order*, 118 F.E.R.C. at 61,193; *Exxon Order*, 118 F.E.R.C. at 61,172–73. The Generators petitioned for rehearing, arguing that their upfront network payments were actually loans to the utilities that did not involve a rate or charge subject to section 206(b). *See, e.g.*, J.A. at 370–71. FERC disagreed, concluding that the upfront payments were not loans but rather a "term or condition for interconnection service that charges the customer and provides an opportunity for refund." *Exxon Rehearing Order*, 119 F.E.R.C. at 62,479. According to FERC, the Generators' complaints challenged a filed rate that could only be revised under section 206. Under section 206(b), the interconnecting generators could only receive credits equal to their initial outlay for Network Upgrades less an amount equal to the transmission service payments made by the generator outside of the statutorily defined refund period. *See id.* at 62,479–80, 62,480 n.39. FERC could refund overpayments made during the refund period, but granting the Generators full transmission credits without subtracting some of their prior rate payments would, according to FERC, violate the refund limits imposed by section 206(b). *See id.* at 62,480 (citing *Duke Hinds III*, 117 F.E.R.C. at 62,115).

We explain this remedy and the rationale behind it more fully below. For now, the important point to keep in mind is that its application to the Generators' claims wiped out any prospect many of them had for obtaining a refund of their upfront network payments. Because the amount most of the Generators paid for transmission service prior to FERC's orders far exceeded their upfront network payments, deducting these rate payments from the total amount of transmission credits that might have been awarded left the Generators with nothing. *See* Reply Br. of Generator Pet'rs at 2. These consolidated petitions for review followed the Commission's orders, and both the Generator and Utility

petitioners challenge FERC's application of its interconnection pricing policies.[1]

## II.

We focus first on the Generators' petitions, which we have jurisdiction to consider under 16 U.S.C. § 825*l*(b). The Generators challenge FERC's orders on three grounds: (1) FERC erred by applying section 206(b); (2) FERC departed from its precedent without adequate explanation; and (3) FERC failed to resolve the complaints within the time allotted by section 206. We review these challenges under the "arbitrary and capricious" standard of the Administrative Procedure Act. *See* 5 U.S.C. § 706(2) (2006). Our review is deferential. We affirm so long as the Commission made a reasoned decision based upon substantial evidence and the path of its reasoning is clear. *See Sithe/Independence Power Partners, L.P. v. FERC*, 165 F.3d 944, 948 (D.C. Cir. 1999).

## A.

We begin with the Generators' argument that section 206(b) does not apply to their claims.

Section 206(a) provides the only mechanism by which FERC can revise established rates:

> Whenever the Commission . . . shall find that any rate, charge, or classification . . . observed [or] charged . . . by any public utility . . . or . . . any rule, regulation, practice, or contract affecting such rate, charge, or

---

[1] The Generators and Utilities each intervened in the other's petitions and Alabama Public Service Commission intervened in support of the Utilities.

classification is unjust, unreasonable, unduly discriminatory or preferential, the Commission shall determine the just and reasonable rate, charge, [or] classification . . . to be thereafter observed and in force, and shall fix the same by order.

16 U.S.C. § 824e(a). Section 206(b) provides the relief FERC may order for amounts paid in excess of the just and reasonable rate:

[T]he Commission may order refunds of any amounts paid [during the refund period] in excess of those which would have been paid under the just and reasonable rate, charge, [or] classification . . . which the Commission orders to be thereafter observed and in force.

*Id.* § 824e(b). "[R]efunds of any amounts paid" outside of the refund period are forbidden. *See Towns of Concord*, 955 F.2d at 72. Section 206 thus creates a strict remedial scheme with two potentially conflicting directives. On the one hand, under section 206(a), FERC cannot allow utilities to charge transmission rates that are unfair. On the other hand, under section 206(b), FERC cannot order utilities to give back money already collected (except for money collected during the limited refund period).

FERC concluded that the twin demands of this statutory scheme precluded awarding the Generators a full refund. As noted, the Commission was faced with a similar set of circumstances in the *Duke Hinds* proceedings. In *Duke Hinds III*, FERC determined that interconnecting generators must receive credits equal to their initial outlay for Network Upgrades less an amount equal to the transmission service payments made by the generator outside of the statutorily

defined refund period. *See* 117 F.E.R.C. at 62,115–16. The rationale behind this remedy is complicated. In simple terms (or at least as simple as we can put them), the remedy ensures compliance with section 206 as follows: Hypothetical transmission credits accrue to interconnecting generators when they pay for a Network Upgrade. Rate payments made thereafter are deemed unjust overpayments because they could have been paid with the credits. The rule against retroactive ratemaking bars FERC from refunding these overpayments unless they occurred during the refund period. To avoid ordering prohibited retroactive relief, FERC reduces the generators' hypothetical transmission credits by an amount equal to their past rate payments made outside of the refund period. To ensure prospective relief, FERC grants the generators the remaining "unused" credits, if any, which may be applied toward the cost of future service. *See generally id.* (explaining pricing policy). In ruling on the Generators' complaints, FERC relied upon this approach and provided the Generators the same remedy. *See, e.g.*, *Exxon Rehearing Order*, 119 F.E.R.C. at 62,480 ("[T]o the extent that ExxonMobil has not previously taken service for which transmission credits either did accrue or would have accrued, ExxonMobil is entitled to receive transmission credits . . . on a prospective basis from the date of the Commission's order." (citing *Duke Hinds III*, 117 F.E.R.C. at 62,115)).

Although FERC's use of *hypothetical* transmission credits may seem puzzling at first glance, upon consideration their use does not make FERC's orders inherently arbitrary as the Generators suggest. *See* Br. of Generator Pet'rs at 25–27. These credits are simply a tool FERC devised to explain its calculations and navigate between the Scylla and Charybdis of section 206—the statute's twin directives that require FERC to ensure reasonable rates and prohibit impermissible refunds. *See Duke Hinds III*, 117 F.E.R.C. at 62,115–16

(explaining how hypothetical credits are used to "ensure prospective relief"). The Commission's reliance on these credits is therefore an exercise of its remedial authority intended to ensure the Generators are charged a just and reasonable rate going forward and made whole within the limits imposed by the statute. When FERC is fashioning remedies, we are particularly deferential. *See Niagara Mohawk Power Corp. v. Fed'l Power Comm'n*, 379 F.2d 153, 159 (D.C. Cir. 1967) ("[T]he breadth of agency discretion is, if anything, at zenith when the action assailed relates primarily . . . to the fashioning of policies, remedies and sanctions.").

With this deferential standard of review in mind, we hold that FERC's remedy is neither arbitrary nor capricious and is consistent with FERC's statutory obligations under section 206. The Generators' central argument is that FERC relied on the mistaken premise that they are seeking a refund of past rates paid for service. The Generators insist that this is not their challenge, and that the refund limits imposed by section 206(b) are irrelevant to their claims. *See* Br. of Generator Pet'rs at 24 ("[T]he Generators do not claim they overpaid for transmission services that were already rendered."). Instead, the Generators contend that their upfront network payments were actually a loan to the utilities for which they are entitled to full reimbursement in the form of transmission service credits. According to the Generators, this credit, which would merely ensure that they pay a just and reasonable rate in the future, falls squarely within FERC's section 206(a) authority to issue prospective relief.

The Generators wish to have their cake and eat it, too. They want the benefits of section 206 (transmission credits), but not on the terms section 206 establishes (refunds restricted to a narrow time period). Their wish fails for two reasons.

First, as FERC explained, it would stretch the Commission's section 206 authority beyond what the language of the statute allows. The only way FERC can provide the Generators prospective relief is through the remedial scheme established by section 206, and FERC lacked the authority to act under section 206(a) unless the Generators challenged an unjust "rate, charge, or classification," or "rule, regulation, practice, or contract affecting [a] rate, charge, or classification." 16 U.S.C. § 824e(a); *see also Exxon Rehearing Order*, 119 F.E.R.C. at 62,479–80, 62,480 n.36 (explaining that "if section 206 . . . did not apply, there would be no statutory basis for directing the payment of transmission credits"). Although the Generators claim they "are not . . . challenging the Commission's jurisdiction under section 206(a)," Reply Br. of Generator Pet'rs at 4–5, they never make clear how their complaints, which "seek[] the return of loaned funds that have been unlawfully retained," Br. of Generator Pet'rs at 28, fit within the statutory framework. Given the plain language of section 206(a), we do not see how they do.

FERC, by contrast, reasonably determined that if the upfront payments were loans, as the Generators assert, the Commission would have no power to order their reimbursement. "The Commission can only order the repayment of unreasonable rates and charges." *Exxon Rehearing Order*, 119 F.E.R.C. at 62,479 n.27. In order to explain how it has authority over the upfront payments—how it can direct an interconnecting generator to make them and order utilities to repay them—FERC characterized the upfront network payments as "a term or condition for interconnection service that charges the customer and provides an opportunity for refund." *Id.* at 62,479 & n.27. Characterized as such, the interconnection agreements and the charges they establish became the filed rate for interconnection upon their acceptance by FERC. *Id.* at 62,479. This conclusion, which

enabled FERC to provide the Generators with prospective relief, is consistent with the language of the statute and its directive that utilities not be permitted to charge unreasonable rates.

The Generators' claim that they do not challenge their past rate payments is also flawed. Under section 206(a), a complainant must challenge an unjust rate or charge collected in the *past* if it wishes to have that rate or charge adjusted for the *future*. 16 U.S.C. § 824e(a). As we just explained, the Generators seek relief under section 206(a) but do not identify the unjust rate they challenge. They concede that their initial upfront network payments were not unjust. *See* Br. of Generator Pet'rs at 24; Reply Br. of Generator Pet'rs at 5. The only rates left to challenge were the payments for transmission service taken after the Generators made upfront network payments. If FERC was to award the Generators any remedy at all under section 206(a), it could only be for past overpayments for transmission service. *See, e.g.*, *Exxon Rehearing Order*, 119 F.E.R.C. at 62,479–80 (explaining why the past transmission rates charged to the Generators violate the Commission's interconnection pricing policies and the remedy allowed by section 206). FERC reasonably determined that the Generators' complaints were, in reality, a challenge to their past rate payments, the refund for which is controlled by section 206(b). And upon finding section 206(b) applicable, FERC specified an appropriate remedy, ensuring that the Generators received prospective relief via their unused credit and were refunded the maximum amount permitted under the statute. *See id.*; *id.* at 62,480 n.37.

The Commission's reasoning is consistent with the demands of the statute. We hold that it properly applied section 206(b) to the Generators' complaints.

**B.**

The Generators next claim that FERC's orders were an unexplained departure from precedent, citing the rule that "an agency changing its course must supply a reasoned analysis indicating that prior policies and standards are being deliberately changed, not casually ignored." *Greater Boston Television Corp. v. FCC*, 444 F.2d 841, 852 (D.C. Cir. 1970); *see also FCC v. Fox Television Stations, Inc.*, No. 07-582, slip op. at 10–11 (U.S. 2009). The Generators assert that FERC's present characterization of the upfront network payments as a charge for interconnection service conflicts with the Commission's earlier description of the payments as a loan from generators to transmission providers.

In the past, FERC has referred to upfront network payments as loans. *See, e.g.*, Standardization of Generator Interconnection Agreements and Procedures (Order No. 2003-C), 70 Fed. Reg. 37,661, 37,662 (June 30, 2005) ("[W]e continue to view the Interconnection Customer's upfront payment for Network Upgrades as essentially a loan . . . ."). But FERC used this term only to explain the economic rationale behind the typical interconnection scenario, in which cost responsibility for all necessary equipment and facilities is fixed when the parties enter into their interconnection agreement. FERC believed the loan analogy made "it easier to explain the transaction involved." *Exxon Rehearing Order*, 119 F.E.R.C. at 62,479.

In the orders on review, FERC explained that the loan analogy is not useful in the unusual scenario presented by this case, in which section 206 complainants seek to alter the cost responsibility established in interconnection agreements entered into before Order No. 2003. As we have just explained, FERC reasonably found that if the upfront network

payments were treated as a loan from the customer to the transmission provider in these circumstances, "the Commission would have no authority over the loan." *Id.* at 62,479 n.27. If FERC was to ensure that the utilities' future rates were just and reasonable, it could not use the loan analogy to describe what is at work here, which is more accurately described as a contest over a charge that is part of the filed rate. Only in these terms would there be an "opportunity for refund," *id.* We believe this explanation is sufficient.[2]

## C.

The Generators' final argument is that FERC acted contrary to law when it delayed consideration of their complaints. Section 206(b) requires FERC to "act as speedily as possible" upon the "institution of a proceeding under [section 206]." 16 U.S.C. § 824e(b). The statute does not, however, set a deadline for action. Rather, it provides that if FERC does not issue a final decision within 180 days after the initiation of a proceeding, it must "state the reasons why it has failed to do so and shall state its best estimate as to when it reasonably expects to make such decision." *Id.*

---

[2] The Generators also argue that the orders on review "have the perverse effect of undermining [FERC's] long-standing policies" and thus FERC should have granted their requested relief. Br. of Generators Pet'rs at 32–35. Regardless of who has the better view of how best to advance FERC's policies, we cannot see how FERC could have ordered the full refund the Generators seek. As FERC explained, the orders grant the Generators the maximum relief allowed under section 206. *Exxon Rehearing Order*, 119 F.E.R.C. at 62,480. FERC lacked the authority to do what the Generators asked.

FERC admits it did not state the reasons for its delay. *See* Br. of FERC at 55. Although the Generators attempt to show they suffered a financial loss as a result of the Commission's delay, they do not allege they suffered harm as a result of FERC's failure to keep them informed. Because the statute merely requires that FERC explain its inaction, this is the harm the Generators must show. Accordingly, we need go no further in considering this claim. *See Air Canada v. Dep't of Transp.*, 148 F.3d 1142, 1156–57 (D.C. Cir. 1998) (stating that under the Administrative Procedure Act, a court need not determine whether an agency acted contrary to law if the party asserting error has not shown it suffered prejudice as a result).

**D.**

We conclude our discussion of the Generators' arguments by addressing the claims advanced only by generator ExxonMobil. Exxon presents two arguments not raised by the other Generators. It first argues that FERC retained authority under section 205 to order the issuance of transmission credits equal to its full upfront network payments. In the alternative, Exxon argues that even if FERC was correct to rely on section 206, it should receive a full refund not limited by any prior rate payments because of its unique factual circumstances. But we need not explain these circumstances or analyze whether Exxon's arguments have merit because Exxon failed to raise either argument in the proceedings below. We thus lack authority to consider them. *See* 16 U.S.C. § 825*l*(b). We note that both claims were raised in another proceeding, *see ExxonMobil Corp. v. Entergy Servs., Inc.*, 120 F.E.R.C. ¶ 61,051 (2007), *reh'g denied*, 122 F.E.R.C. ¶ 61,168 (2008), and may be reviewed by this court in due course. Accordingly, Exxon's petition for review is denied.

**III.**

And now, for the flip side of the coin. The Utility petitioners are three public utility companies that have interconnection agreements with the Tenaska generators.[3] They argue that FERC violated both the filed rate doctrine and the rule against retroactive ratemaking by granting those generators transmission service credits for their upfront network payments. Because the Utilities lack standing, we do not reach the merits of their challenge.

Section 313 of the FPA permits any party "aggrieved" by an order of the Commission to seek rehearing and petition for judicial review. 16 U.S.C. § 825*l*. A party can obtain judicial review "if it can establish both the constitutional and prudential requirements for standing." *Pub. Util. Dist. No. 1 v. FERC*, 272 F.3d 607, 613 (D.C. Cir. 2001). To establish constitutional standing, a petitioner must show an actual or imminent injury in fact, fairly traceable to the challenged agency action, that will likely be redressed by a favorable decision. *See, e.g.*, *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992).

In their opening brief, the Utilities claimed standing on the ground that FERC's orders require them to modify their interconnection agreements and provide the Tenaska generators with transmission credits. Br. of Util. Pet'rs at 14–15. Not so. As the Generators point out, and the Utilities ultimately conceded in their reply brief and at oral argument, FERC's remedy does not actually require the Utilities to issue transmission credits. *See* Reply Br. of Util. Pet'rs at 17 n.12; Oral Arg. Recording at 18:05–:15 ("We did not have to pay

---

[3] Specifically, they are Tenaska Alabama II Partners, L.P., Tenaska Alabama Partners, L.P., and Tenaska Georgia Partners, L.P.

any refunds."). FERC decreased its award of credits, initially set equal to each generator's upfront network payments, by the rate payments made by the generator outside of the refund period. Because those payments exceeded the Tenaska generators' upfront network payments, the Utilities are not obligated to issue any credit whatsoever. *See* Reply Br. of Util. Pet'rs at 17 n.12 ("It warrants note that . . . Tenaska had taken delivery service in excess of any credits that might be due it *well before* it filed complaints.").

In their reply brief, the Utilities suggest a second injury to support their claim of standing: affirmance of the Commission's orders would collaterally estop them from challenging a similar remedy in the future. We have previously made clear, however, that a mere interest in FERC's legal reasoning and the possibility of a "collateral estoppel effect" are insufficient to confer a cognizable injury in fact. *Ala. Mun. Distribs. Group v. FERC*, 312 F.3d 470, 473–74 (D.C. Cir. 2002); *see also Sea-Land Serv., Inc. v. Dep't of Transp.*, 137 F.3d 640, 648 (D.C. Cir. 1998) (discussing but not resolving whether a potential collateral estoppel effect can confer standing). "To create standing out of the preclusive effect that *would* flow from granting standing is to create it ex nihilo." *Ala. Mun. Distribs. Group*, 312 F.3d at 474.

Finally, at oral argument, the Utilities suggested they were harmed by FERC's orders because they were required to expend resources revising their interconnection agreements and filing a compliance report with FERC. In the next breath, however, the Utilities conceded that such costs could not be reimbursed and therefore are not redressable by a favorable decision of this court. *See* Oral Arg. Recording at 22:15–:26; *see also Klamath Water Users Ass'n v. FERC*, 534 F.3d 735, 740–41 (D.C. Cir. 2008) (petitioner's failure to show

redressability required dismissal because "the burden of establishing redressability falls upon the petitioner"). In any event, this argument came too late for our consideration. We will not consider a theory of standing first presented to us at oral argument. *See Transp. Workers Union of Am. v. Transp. Sec. Admin.*, 492 F.3d 471, 476–77 (D.C. Cir. 2007) (refusing to consider claim relating to causation requirement not raised until oral argument).

## IV.

For the foregoing reasons, we deny the Generators' petitions for review. Because the Utilities lack standing to challenge FERC's orders, we dismiss their petitions for want of jurisdiction.

*So ordered.*