# United States Court of Appeals
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

Argued November 20, 2017       Decided February 6, 2018

No. 16-1093

KANSAS CORPORATION COMMISSION,
PETITIONER

v.

FEDERAL ENERGY REGULATORY COMMISSION,
RESPONDENT

SOUTH CENTRAL MCN LLC, ET AL.,
INTERVENORS

Consolidated with 16-1164

On Petitions for Review of Orders of the
Federal Energy Regulatory Commission

*Jason T. Gray* argued the cause for the petitioner. *Kathleen L. Mazure* was with him on brief.

*Anand R. Viswanathan*, Attorney, Federal Energy Regulatory Commission, argued the cause for the respondent. *Robert H. Solomon*, Solicitor, and *Susanna Y. Chu*, Attorney, were with him on brief. *Lona T. Perry*, Attorney, entered an appearance.

*Steven J. Ross* argued the cause for the intervenors. *Shaun M. Boedicker*, *Michael F. McBride*, *William L. Massey*, *Mark L. Perlis* and *Kevin F. King* were with him on brief

Before: HENDERSON and SRINIVASAN, *Circuit Judges*, and GINSBURG, *Senior Circuit Judge*.

Opinion for the Court filed by *Circuit Judge* HENDERSON.

KAREN LECRAFT HENDERSON, *Circuit Judge*: Petitioner Kansas Corporation Commission (KCC), a Kansas regulatory body that oversees Kansas public utilities, asserts that the Federal Energy Regulatory Commission (FERC) acted unlawfully by approving formula rates—which help determine the electric rates charged by public utilities to consumers in FERC jurisdictions—for future public utilities to use in operating electric transmission facilities. KCC argues that FERC cannot determine, as it must under the Federal Power Act, 16 U.S.C. §§ 792 *et seq.*, that the formula rates for such not-yet-existing entities to implement at some point in the future are "just and reasonable," *id.* § 824d(a). By that same argument, however, KCC has not suffered an injury in fact sufficient to establish standing. A harm that will not occur unless a series of contingencies occurs at some unknown future time is not concrete, particularized, actual and imminent. Accordingly, we dismiss KCC's petitions for review.

## I. BACKGROUND

FERC regulates the rates of public utilities engaged in the wholesale transmission of electric energy in interstate commerce. 16 U.S.C. § 824(a), (e). FERC must ensure, under section 205 of the Federal Power Act, that public utilities' rates are "just and reasonable." *Id.* § 824d(a) ("All rates and charges made, demanded, or received by any public utility for or in connection with the transmission or sale of electric energy . . .

shall be just and reasonable, and any such rate or charge that is not just and reasonable is hereby declared to be unlawful."). To do so, "every public utility shall file with" FERC, "[u]nder such rules and regulations as [FERC] may prescribe . . . and in such form as [FERC] may designate," "schedules showing all rates and charges for any transmission or sale" of electricity. *Id.* § 824d(c). Section 206 of the Federal Power Act allows FERC—on its own initiative or upon a third-party complaint— to adjust previously-approved rates if they are no longer just and reasonable. *Id.* § 824e(a) ("Whenever [FERC], after a hearing held upon its own motion or upon complaint, shall find that any rate . . . is unjust, unreasonable, unduly discriminatory or preferential, [FERC] shall determine that just and reasonable rate . . . and shall fix the same by order.").

FERC encourages public utilities to participate in regional processes that allocate the costs of new energy transmission facilities on a region-wide basis. *See S.C. Pub. Serv. Auth. v. FERC*, 762 F.3d 41, 49–53 (D.C. Cir. 2014) (providing overview of electric industry). The Southwest Power Pool (SPP) is a FERC-regulated Regional Transmission Organization that currently provides electricity to parts of fourteen states[1] on behalf of member public utilities. The SPP uses a selection process by which incumbent and

---

[1] Arkansas, Iowa, Kansas, Louisiana, Minnesota, Missouri, Montana, Nebraska, New Mexico, North Dakota, Oklahoma, South Dakota, Texas and Wyoming. *Electric Power Markets: Southwest Power Pool—Overview*, FEDERAL ENERGY REGULATORY COMMISSION, www.ferc.gov/market-oversight/mkt-electric/spp.asp (last visited Dec. 27, 2017). At the time of FERC's orders, the SPP extended to eight states only (Arkansas, Kansas, Louisiana, Missouri, Nebraska, New Mexico, Oklahoma and Texas, *see Southwest Power Pool, Inc.*, 144 FERC ¶ 61,059 at P 25 (2013)) but has since expanded to fourteen.

nonincumbent utilities bid for the right to develop transmission projects within the SPP footprint.

The SPP recovers transmission rates on behalf of utilities operating transmission facilities in the SPP's region through its FERC-jurisdictional tariff. Part of the SPP's tariff is the facility's formula rate. A formula rate "specifies the cost components that form the basis of the rates a utility charges its customers" in a "fixed, predictable nature," which allows utilities to recover costs that "fluctuate over time" and prevents them from using "excessive discretion in determining the ultimate amounts charged to customers." *Pub. Utils. Comm'n of Cal. v. FERC*, 254 F.3d 250, 254 (D.C. Cir. 2001) (internal quotation omitted). KCC's petitions involve two FERC orders approving formula rates for future utilities that may seek to develop transmission facilities in the SPP's region.

Transource Energy, LLC is a parent company that "serves as the holding company for transmission development-focused subsidiaries" nationwide. Joint Appendix (JA) 25. Transource Energy wanted to develop electric transmission facilities in the SPP's regional footprint. Because of statutory and regulatory differences about "public utility governance and the issuance of securities" among the various states in the SPP, Transource Energy wanted to create state-specific subsidiaries which would then submit state-specific bids for SPP facilities. JA 17. Transource Energy formed Transource Kansas, a wholly owned subsidiary, to compete for Kansas-based transmission projects. Transource Energy also anticipates creating more state-specific subsidiaries in SPP states (*e.g.*, Transource Arkansas) that will be "formally established as legal entities at the time Transource Energy submits its bid to develop a [transmission facility] within the corresponding state in the SPP footprint." JA 25.

Transource Kansas wanted to get a formula rate approved before it bid for SPP transmission facilities. Without advance approval of the formula rate, it would be unable to competitively bid for two reasons. First, the SPP evaluates bids in part on a transmission facility's charges, which are based in part on the formula rate; without an approved formula rate, Transource Kansas would be at a competitive disadvantage compared with other facilities that did have approved formula rates. Second, a utility has 180 days to bid for a transmission facility but cannot obtain FERC approval of a formula rate for up to one or two years, making it "impractical" to wait for FERC approval until the bidding window opens. JA 20.

For the same reasons, Transource Energy also wanted to get formula rates approved for future state-specific subsidiaries (*e.g.*, Transource Arkansas). Accordingly, when Transource Kansas submitted the requisite section 205 filings to secure formula rate approval, it also asked FERC to authorize future affiliates (*e.g.*, Transource Arkansas) to replicate the formula rate approved for Transource Kansas if they won a bid. Transource Kansas explained that the data it submitted to show that its formula rate was just and reasonable would be used by the future affiliates that shared the same parent company.

KCC, which is authorized to regulate rates for the sale of electricity to Kansas consumers, *see* KAN. STAT. ANN. § 66-101 (KCC has "full power, authority and jurisdiction to supervise and control the electric public utilities" in Kansas), objected. It argued that preapproving a formula rate for a future affiliate violated FERC's section 205 mandate to ensure that charged rates are just and reasonable. FERC, however, granted Transource Kansas's request. *Order on Transmission Formula Rate Proposal and Incentives*, 151 FERC ¶ 61,010 at P 81 (Apr. 3, 2015). FERC instructed that "if and when" SPP awarded a bid to Transource Kansas, its section 205 filings should be

labeled as the *pro forma* templates "for use by any Transource [affiliates], which will obviate the need to make additional section 205 filings." *Id.*

KCC requested a rehearing, which FERC denied. *Order on Rehearing and Compliance*, 154 FERC ¶ 61,011 (Jan. 8, 2016). FERC reasoned that future Transource affiliates will be "similarly situated with respect to risk and capital requirements" to Transource Kansas so it made sense to allow both to use the same formula rate. *Id.* at P 17. FERC also reasoned that preapproving a formula rate for Transource Kansas, which did not operate any active transmission facilities, was "no different" from preapproving a formula rate for future Transource affiliates. *Id.* Accordingly, FERC "s[aw] no reason at this time to litigate" separate formula rates for Transource Kansas and its future sibling affiliates of the same parent company. *Id.* at P 18.

MPT Heartland Development, LLC is another parent company that, like Transource Energy, serves as a holding company for subsidiaries created to develop transmission facilities. MPT Heartland similarly formed Kanstar, a wholly owned subsidiary, to compete for Kansas-specific projects. MPT Heartland anticipates bidding on behalf of future state-specific subsidiaries for transmission facilities. The subsidiaries will be formally established as legal entities and will take control of the transmission facilities if MPT Heartland wins the bid. As with Transource Kansas, Kanstar submitted a filing to FERC under section 205 requesting a formula rate for its own use and approval for future Kanstar affiliates (*e.g.*, Arkstar) to replicate its formula rate. KCC protested the request. FERC accepted Kanstar's proposal in relevant part and rejected KCC's protest. *Order on Transmission Formula Rate Proposal and Incentives*, 152 FERC ¶ 61,209 at PP 83–84 (Sept. 17, 2015). KCC filed a request for rehearing of the

Kanstar order. FERC denied rehearing "for the same reasons" that FERC denied rehearing of the Transource Kansas order. *Order Denying Rehearing*, 155 FERC ¶ 61,167 at P 9 (May 19, 2016).

KCC petitions for review of FERC's April 3, 2015 and January 8, 2016 orders (Transource Kansas) as well as its September 17, 2015 and May 19, 2016 orders (Kanstar).

## II. ANALYSIS

On the merits, KCC argues that FERC's orders "contravene[]" the Federal Power Act. Pet'r's Br. at 28. Under KCC's reading, public utilities have an "obligation" to prove their electric rates are "just and reasonable" and FERC has a corresponding mandate to authorize only just and reasonable rates under section 205. Pet'r's Br. at 34 (discussing 16 U.S.C. § 824d(a)). KCC asserts that the "principal error in the challenged orders" is that FERC has authorized future affiliates (*e.g.*, Transource Arkansas and Arkstar) to replicate, "at some unknown time in the future," the formula rates approved for use by Transource Kansas and Kanstar without the former, if formed, having to submit the requisite section 205 filings to establish the justness and reasonableness of those rates. Pet'r's Br. at 27. FERC's error, KCC asserts, shifted the burden to entities such as KCC to challenge the formula rates in a later section 206 proceeding, in which the challenger must prove the rates are in fact unjust or unreasonable. *See* 16 U.S.C. § 824e(a) (authorizing FERC to initiate, "upon [third-party] complaint," proceeding to determine if rates are no longer just and reasonable and, if so, adjust them); *Maine v. FERC*, 854 F.3d 9, 21 (D.C. Cir. 2017) (in section 206 proceeding, "burden of demonstrating that the existing [rate] is unlawful is on . . . the complainant").

8

But we cannot address the merits without ensuring KCC has the "irreducible constitutional minimum of standing." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992). As detailed below, we conclude that KCC does not have standing because it lacks the necessary injury in fact.

To satisfy the constitutional requirements for standing, a party must have (1) an injury in fact, (2) fairly traceable to the challenged agency action, (3) that will likely be redressed by a favorable decision. *Id.* at 560–61. An injury in fact is an "invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical." *Id.* at 560 (internal quotation omitted). Because KCC is not the "object of the [agency] action" it challenges, its injury is not "self-evident." *Sierra Club v. EPA*, 292 F.3d 895, 900 (D.C. Cir. 2002). Accordingly, it bears the burden to identify record evidence sufficient to support its standing to seek review. *Id.* at 899.

KCC's opening brief cursorily states that "FERC's unfavorable rulings on the issues on appeal render KCC an aggrieved party." Pet'r's Br. at 32. FERC's rejection of KCC's challenges in the proceedings before it, however, does not establish constitutional standing. *See N.Y. Reg'l Interconnect, Inc. v. FERC (NYRI)*, 634 F.3d 581, 586 (D.C. Cir. 2011) (party does not acquire requisite "direct stake in a litigation simply by participating in the antecedent administrative proceedings" (internal quotation omitted)). KCC must affirmatively demonstrate how it is adversely affected by FERC's orders. *See Sierra Club*, 292 F.3d at 899.

KCC's more thorough effort made in its reply brief fares no better. It asserts that FERC's contravention of the Federal Power Act is sufficient to support its standing. *See* Reply Br. at 6 (FERC orders "constitute[] concrete and particularized harm

to KCC and Kansas ratepayers because FERC determined, in advance, that [nonexistent] affiliates need not justify their rates at the future point in time when they propose to provide" electric service); *id.* at 7 (identifying "concrete harm" as "FERC's predetermination that not-yet-formed affiliates' rates are just and reasonable despite no such demonstration by those affiliates under FPA Section 205"); *id.* at 9 ("[The] harm to the KCC—undermining the FPA's consumer-protection focus by pre-approving rates that have not been shown to be just and reasonable for the not-yet-formed affiliates authorized to charge those rates—has already occurred.").

United States Supreme Court precedent does not support KCC's theory of harm. A party claiming "only harm to his . . . interest in [the] proper application of the . . . laws, and seeking relief that no more directly and tangibly benefits him than it does the public at large," has no concrete and particularized injury. *Lujan*, 504 U.S. at 573–74. KCC's argument that it is harmed because FERC violated the Federal Power Act and determined legal rights is no more than a generalized interest in the proper application of the law. That is not enough. *See Capital Legal Found. v. Commodity Credit Corp.*, 711 F.2d 253, 258 (D.C. Cir. 1983) (A "party who would complain that agency action has violated [a statute] must be adversely affected by that action").

At oral argument, KCC identified a more specific harm: its "future" burden of initiating a section 206 proceeding to challenge the formula rates as unjust or unreasonable. *See* Oral Argument at 3:50–3:55. As KCC's theory goes, a public utility must demonstrate under section 205 that its rates are just and reasonable before commencing service. *See* 16 U.S.C. § 824d(a). FERC's orders preapproving formula rates for future affiliates that have not yet made section 205 filings to establish the justness and reasonableness of the rates, KCC

argues, improperly invert the Federal Power Act's allocation of burdens. KCC will have to challenge the same formula rates in a section 206 proceeding, when it will bear the burden to prove the rates are unjust or unreasonable.

But that harm is not imminent, as demonstrated by KCC's own arguments on the merits. It repeatedly argues that FERC could not determine the formula rates were just and reasonable because the formula rates will not be used until "some unknown time in the future." Pet'r's Br. at 10, 15, 17, 25, 27, 33, 44, 51. A petitioner that asserts a harm that may occur "some day," with no "specification of *when* the some day will be," does not establish its standing. *Lujan*, 504 U.S. at 564; *see Pub. Citizen v. NHTSA*, 489 F.3d 1279, 1293–94 (D.C. Cir. 2007) (no imminent harm to petitioner challenging rulemaking that allegedly increased risks of car accidents because "the time (if ever) when any such accident would occur is entirely uncertain").

Instead, any harm to KCC is "conjectural or hypothetical." *Lujan*, 504 U.S. at 560. The particularized effect of FERC's orders will not be felt by KCC unless an "attenuated chain of possibilities" occurs. *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 410 (2013). It will not be harmed until and unless (1) the parent company submits a bid for transmission facilities; (2) the SPP awards the bid to the parent company of the then-formed subsidiary, *e.g.*, Transource Arkansas or Arkstar; (3) the subsidiary seeks to use the formula rates; and (4) KCC commences a section 206 proceeding.

KCC points to nothing in the record to meet its burden to show a "substantial probability" that all of these steps will occur and, if so, when. *Am. Petroleum Inst. v. EPA*, 216 F.3d 50, 63 (D.C. Cir. 2000) (internal quotation omitted). It does not assert that any bid by the parent company is pending. Even if a

bid had been placed, KCC's feared result depends on the SPP—an independent third party—accepting the bid. KCC provides no supporting evidence that the SPP is more likely to select the bids of Transource Kansas or Kanstar affiliates' parent company than bids of other companies. We are "usual[ly] reluctan[t] to endorse standing theories that rest on speculation about the decisions of independent actors," *Clapper*, 568 U.S. at 414, and we will not break with that general rule here. Finally, even if the SPP does select bids made by the parent companies on behalf of future Transource Kansas or Kanstar affiliates, it is uncertain that KCC will initiate a section 206 proceeding. The formula rates may not, in the end, turn out to be unjust or unreasonable at the time they are imposed. If that is so, KCC would have no reason to bring a section 206 proceeding and there would be no harm. *See* Oral Argument at 5:20–5:30 (KCC counsel acknowledging that "it may turn out that there is no issue" because formula rates may be just and reasonable). In sum, then, KCC's alleged harm "stacks speculation upon hypothetical upon speculation, which does not establish an actual or imminent injury." *NYRI*, 634 F.3d at 587 (internal quotation omitted).

Further, KCC's reliance on *ANR Pipeline Co. v. FERC*, 771 F.2d 507 (D.C. Cir. 1985), is unavailing. In that case, the petitioner had standing because FERC's approval of a pipeline company's rate increase was necessarily adverse to the petitioner because it automatically took effect as soon as the pipeline company filed to implement the new rate, which filing the Court found "unavoidable." *Id.* at 516. In contrast, if the preapproved formula rates here are ever put into effect, KCC may not necessarily challenge them because, as pointed out *supra*, KCC may view the formula rates as just and reasonable when imposed. Moreover, the SPP may never select Transource Kansas or Kanstar affiliates to operate transmission facilities within the SPP's footprint. Thus, KCC's alleged harm

is not "unavoidable." *See NYRI*, 634 F.3d at 587 (denying corporation's standing to challenge FERC orders because alleged harm "rests upon a hypothetical chain of events, none of which is certain to occur"); *see also Whitmore v. Arkansas*, 495 U.S. 149, 155 (1990) (injuries must be "concrete" in "temporal sense").

One final bit of housekeeping. KCC stated that it needs judicial review now because FERC, in any proceeding initiated by a future affiliate to use the preauthorized formula rates, will be bound by the orders at issue here. Although in its reply brief KCC expressly disclaimed that it relied on this theory to establish standing, Reply Br. at 11 (denying that it "relies on any precedential effect of the rulings below to establish standing"), we address the issue because KCC nonetheless expressed its concern, *see* Reply Br. at 6 ("These petitions present the only opportunity to challenge [FERC's] findings without facing claims of collateral attack."); Oral Argument at 2:30–2:45 ("At any future proceeding, the Kansas Commission would not have the opportunity to challenge [FERC's] determinations. This appeal is the only opportunity."). Whether or not KCC is correct in its assertions, its now-or-never argument cannot establish standing. We have repeatedly rejected similar arguments. *See New England Power Generators Ass'n, Inc. v. FERC*, 707 F.3d 364, 369 (D.C. Cir. 2013) ("[N]either a FERC decision's legal reasoning nor the precedential effect of such reasoning confers standing unless the substance of the decision itself gives rise to an injury in fact."); *Exxon Mobil Corp. v. FERC*, 571 F.3d 1208, 1219 (D.C. Cir. 2009) ("[A] mere interest in FERC's legal reasoning and the possibility of a 'collateral estoppel effect' are insufficient to confer a cognizable injury in fact.").

For the foregoing reasons, we dismiss KCC's petitions for lack of standing.

*So ordered.*