**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

CITY OF REDDING, CALIFORNIA,
     *Petitioner,*

NORTHERN CALIFORNIA POWER
AGENCY,
     *Petitioner-Intervenor,*

     v.

FEDERAL ENERGY REGULATORY
COMMISSION,
     *Respondent,*

PEOPLE OF THE STATE OF
CALIFORNIA; PACIFIC GAS AND
ELECTRIC COMPANY; PUBLIC
UTILITIES COMMISSION OF THE
STATE OF CALIFORNIA; SOUTHERN
CALIFORNIA EDISON COMPANY,
     *Respondents-Intervenors.*

No. 09-72775

FERC No.
EL00-95-202

ARIZONA ELECTRIC POWER
COOPERATIVE, INC.,
                    *Petitioner,*

NORTHERN CALIFORNIA POWER
AGENCY,
              *Petitioner-Intervenor,*

          v.                          No. 09-72789

FEDERAL ENERGY REGULATORY            FERC No.
COMMISSION,                          EL00-95-202
                    *Respondent,*

CALIFORNIA INDEPENDENT SYSTEM
OPERATOR CORPORATION,
          *Respondent-Intervenor.*


BONNEVILLE POWER
ADMINISTRATION; WESTERN AREA
POWER ADMINISTRATION,                 No. 09-72791
                    *Petitioners,*
                                     FERC No.
          v.                          EL00-95-202

FEDERAL ENERGY REGULATORY             OPINION
COMMISSION,
                    *Respondent.*


On Petition for Review of an Order of the
Federal Energy Regulatory Commission

Argued and Submitted
September 23, 2010—San Francisco, California

Filed August 27, 2012

Before: Sidney R. Thomas, M. Margaret McKeown, and
Richard R. Clifton, Circuit Judges.

Opinion by Judge Clifton;
Dissent by Judge McKeown

## COUNSEL

Michael F. Hertz, Thomas M. Bondy, Mark Pennak (argued), Department of Justice, Washington, DC, Bonneville Power Administration and Western Area Power Administration, petitioner.

William L. Slover, Robert D. Rosenberg, Stephanie P. Lyons, Stephanie M. Adams, Slover & Loftus LLP, Washington, DC, for Arizona Electric Power Cooperative, Inc., petitioner.

Robert C. McDiarmid, Peter J. Hopkins, Margaret Meiser, Spiegel & McDiarmid LLP, Washington, DC, for Northern California Power Agency, petitioner.

Peter J. Scanlon, Lisa S. Gast, Jason T. Gray, Duncan Weinberg, Genzer & Pembroke, P.C., Washington, DC, for the City of Redding, California, petitioner.

Thomas R. Sheets, Robert H. Solomon, Lona T. Perry (argued), Washington, DC, for Federal Energy Regulatory Commission, respondent.

Frank R. Lindh, Mary F. McKenzie, Candace J. Morey, San Francisco, California, for Public Utilities Commission of California, respondent-intervenor.

Mark D. Patrizio, Pacific Gas and Electric Company, San Francisco, California, and Stan Berman, Sidley Austin LLP, Seattle, Washington, for Pacific Gas and Electric Company, respondent-intervenor.

Richard L. Roberts (argued) and Catherine M. Giovannoni, Steptoe & Johnson LLP, Washington, DC, and Russell Swartz and Leon Bass, Jr., Southern California Edison Company, Rosemead, California, for Southern California Edison Company, respondent-intervenor.

Edmund G. Brown, Jr., Attorney General, James M. Humes, Chief Deputy Attorney General, and Matt Rodriquez, Chief Assistant Attorney General, Sacramento, California, David M. Gustafson, Deputy Attorney General, Oakland, California, Kevin J. McKeon and Lillian S. Harris, Hawke McKeon & Sniscak LLP, Harrisburg, Pennsylvania, for the People of the State of California, respondent-intervenor.

Daniel Shonkwiler, Folsom, California, for California Independent System Operator Corporation, respondent-intervenor.

## OPINION

CLIFTON, Circuit Judge:

This story begins over a decade ago during the California energy crisis of 2000 and 2001. This court[1] and this panel[2]

---

[1]*See, e.g.*, *California ex rel. Lockyer v. Dynegy, Inc.*, 375 F.3d 831 (9th Cir. 2004); *In re California Power Exch. Corp.*, 245 F.3d 1110 (9th Cir. 2001); *Pub. Util. Dist. No. 1 of Snohomish Cnty. v. Dynegy Power Mktg. Inc.*, 384 F.3d 756 (9th Cir. 2004).

[2]*See, e.g.*, *Port of Seattle v. FERC*, 499 F.3d 1016 (9th Cir. 2007); *Bonneville Power Admin. v. FERC*, 422 F.3d 908 (9th Cir. 2005); *California ex rel. Lockyer v. FERC*, 383 F.3d 1006 (9th Cir. 2004); *Pub. Utils. Comm'n of Cal. v. FERC*, 462 F.3d 1027 (9th Cir. 2006) ("*PUC of California*").

have become very familiar with those events. After California deregulated and restructured its electricity market in the mid 1990s, prices skyrocketed. The Federal Energy Regulatory Commission ("FERC") attempted to ameliorate this problem by ordering refunds from both jurisdictional (public) and non-jurisdictional (non-public) entities for prices paid above what FERC later determined to be the just and reasonable rate. We held, in *Bonneville Power Administration v. FERC*, 422 F.3d 908 (9th Cir. 2005), that FERC lacked authority to order refunds from those entities not under its jurisdiction, namely the non-public utilities. In a set of orders subsequent to *Bonneville* — the orders that we now review — FERC stated that it had "revised" or "reset"[3] the market rates for the period for which it had ordered refunds, and that its authority to do so stemmed from § 206 of the Federal Power Act ("FPA"), 16 U.S.C. § 824e. It is from these Orders that Petitioners,[4] a group of municipal and federal governmental entities, which sold electricity in the affected markets but who are outside of FERC's refund jurisdiction,[5] appeal.

---

[3]The terms "revised" and "reset" are used interchangeably, as are "non-public" and "non-jurisdictional."

[4]The term "Petitioners" inclusively refers to Bonneville Power Administration ("BPA"), Western Area Power Administration ("Western"), and the other original Indicated Public Entity Petitioners — Northern California Power Agency, Modesto Irrigation District, City of Redding, Turlock Irrigation District, Arizona Electric Power Cooperative, Inc., Sacramento Municipal Utility District, City of Santa Clara, City of Glendale, and City of Burbank.

[5]It is a source of regular confusion among those who do not customarily reside in the world of regulated utilities that the definition of "public" utilities excludes governmental entities such as the Petitioners in this case (cities, counties, local irrigation districts, and state and federal agencies), even though in other context those entities are understood to be "public" agencies. *See Bonneville*, 422 F.3d at 915-16; 16 U.S.C. § 824(f) (FPA § 201(f)). In the FERC context, "public" utilities over which FERC has greater authority are principally privately owned businesses, commonly referred to as "investor-owned utilities" or "regulated utilities."

We do not agree with FERC's assertion that it has broad authority under § 206 of the FPA to retroactively reset rates that were charged in the California electricity markets during the time in question, October 2, 2000 through June 20, 2001. As we held in *Bonneville*, the FPA grants FERC the authority to investigate rates and to order refunds only from public utilities. *Bonneville*, 422 F.3d at 911. Nonetheless, we conclude that the specific FERC Orders that are challenged in the current petitions for review do not exceed the limits on FERC's authority. As a result, we deny the petitions.

## I.  Factual and Procedural Background

Only a brief summary of the long and detailed history of the California energy crisis and subsequent litigation is necessary here. In the mid-1990's, California restructured its electric energy markets in an attempt to lower electricity prices that were far higher than the national average. As part of its plan, California created two non-profit public benefit corporations: the California Power Exchange ("CalPX") and the California Independent System Operator ("ISO"). The former oversaw a statewide electricity auction market, which it operated subject to FERC tariffs and rate schedules. The latter managed the flow of the electricity transmission grid.

Together CalPX and ISO operated single-price auction spot markets for the wholesale sale of electricity. California's investor-owned ("public") utilities were required to purchase the electricity their customers needed in this market. *In re California Power Exch. Corp.*, 245 F.3d at 1114-15.[6] The primary sellers in the market were merchant generators who owned power plants that had been divested by the investor-owned utilities during an earlier phase of deregulation. *Id.*; 94

---

[6]California's investor-owned utilities were sellers as well as buyers because California's restructuring law required them to offer into the market all of the electricity they generated themselves. *In re California Power Exch. Corp.*, 245 F.3d at 1114-15.

FERC ¶ 61245, at 61864-65, 2001 WL 406581 (2001). These merchant generators were considered "public utilities" subject to FERC regulation. 94 FERC ¶ 61245, at 61864-65.

Power-producing municipal and federal government entities also sold electricity into the market. These entities are "non-public" utilities not subject to FERC's jurisdiction.

Sellers of electricity, both public and non-public, would bid into the market until sufficient power was secured to meet demand, at which point all sellers were paid the price bid by the seller whose electricity was needed to "clear the market." *See generally Bonneville*, 422 F.3d at 911-12.

Although intended to reduce prices for electricity, the CalPX and ISO electric energy markets produced prices far above those in prior years, at comparable load levels. In August of 2000, San Diego Gas & Electric Company ("SDG&E") filed a complaint with FERC alleging that the rates charged on the CalPX and ISO markets, the market clearing prices, "d[id] not reflect legitimate forces of supply and demand." In response, FERC initiated hearing proceedings to investigate the justness and reasonableness of the CalPX/ISO rates. 92 FERC ¶ 61,172, 2000 WL 1204898 (2000). On November 11, 2000, FERC issued an order declaring that it would "determine whether public utility sellers to the ISO and PX are charging unjust and unreasonable rates." 93 FERC ¶ 61,121, at 61,357, 2000 WL 1637060 (2000) ("November 2000 Order").

Following an investigation, on March 9, 2001, FERC issued another order in which it concluded that the CalPX/ISO rates were in fact unjust and unreasonable. In this order, FERC established a mitigation plan and set a mitigated market clearing price — the price that would have been in effect "had there been competitive forces at work" — above which refunds may be required. 94 FERC ¶ 61,245, at 61,862. The order noted that, as to non-public utility sellers,

FERC "has no authority to order such sellers to make refunds." *Id.* at 61,864.

In a July 25, 2001 order ("July 2001 Order"), FERC announced that the transactions subject to refund would "include sales by public and *nonpublic utilities* into these markets." *Bonneville*, 422 F.3d at 913 (quoting 96 FERC ¶ 61,120, at 61,499, 2001 WL 1704964 (2001)) (emphasis in *Bonneville*). FERC offered the following description of its authority to retroactively reset the market rates:

> A number of parties confuse the just and reasonable standard with the authority to order retroactive refunds of unjust and unreasonable rates. Whether rates are unjust and unreasonable is a separate issue from whether the Commission is authorized under the statute to order refunds retroactively. Under FPA section 206, if the Commission finds that rates no longer meet the just and reasonable standard, the Commission has a statutory obligation to fix a new rate or to fix practices "to be thereafter observed." *In amending FPA section 206, Congress did not give the Commission authority to modify unjust and unreasonable rates retroactively.*

96 FERC ¶ 61,120, at 61,505 (emphasis added) (quoting 16 U.S.C. § 824e(a)).

Following the July 2001 Order, non-public utilities brought a petition for review to this court. In our 2005 opinion in *Bonneville*, we held that in keeping with Congress's clearly expressed intent, FERC lacked jurisdiction over non-public utilities and could not order them to pay refunds. 422 F.3d at 911, 920. As we observed in passing, for those who purchased electricity from non-public sellers "the remedy, if any, may rest in a contract claim, not a refund action," *id.* at 925, but we followed this statement with the proviso that "we take no position on remedies available outside of the FPA," *id.* at 926.

In proceedings following the remand from *Bonneville*, FERC issued a new order on October 19, 2007 ("October 2007 Order"). 121 FERC ¶ 61,067, at 61,346, 2007 WL 3047581 (2007). FERC expressed in Paragraph 36 of this Order its understanding of our decision in *Bonneville* and of its impact on FERC's orders:

> California Parties assert that the Commission revised the pricing formulations contained in the [CalPX/ISO] tariffs for the period to which the MMCP [mitigated market clearing price] applies. We disagree. The *Bonneville* court found that the Commission had ordered refunds rather than amending the [CalPX/ISO] tariffs to reset the market clearing price during the refund period. The court further found that the Commission had acted outside its jurisdiction when ordering non-public utility entities to pay these refunds. Therefore, we vacate each of the Commission's orders in the California refund proceeding to the extent that they order non-public utility entities to pay refunds.

121 FERC ¶ 61,067, at 61,352 (footnotes omitted).[7]

The California Parties sought clarification of Paragraph 36, arguing that FERC had misleadingly implied it did not reset the market clearing prices and that *Bonneville* held as much. *See* 121 FERC ¶ 61,188, at 61,924, 2007 WL 4103712 (2007) ("November 2007 Order"). FERC responded with another order on November 19, 2007. *Id.* This order stated that FERC's October 2007 Order had "inadvertently mischaracterized" both *Bonneville* and its prior orders. *Id.* at 61,925. FERC agreed with the California Parties that "estab-

---

[7]The "California Parties", in the context of this Order, include the State of California, the California Electricity Oversight Board, the Public Utilities Commission of California, Pacific Gas and Electric, Southern California Edison, and SDG&E. 121 FERC ¶ 61,067, at 61,348 n.20.

lishing a just and reasonable rate is a prerequisite for ordering refunds," and "made clear that it was resetting the marketing clearing prices" in the July 2001 Order. *Id.* Accordingly, FERC amended Paragraph 36 of the October 2007 Order to read:

> California Parties assert that the Commission revised the pricing formulations contained in the [CalPX/ISO] tariffs for the period to which the MMCP applies. We *do not* disagree. The *Bonneville* court found that the Commission had ordered refunds *by non-jurisdictional entities* rather than *merely* amending the [CalPX/ISO] tariffs to reset the market clearing price during the refund period.

*Id.* at 61,926.

The controversy was not quelled. The various Petitioners in this case, all non-public utilities for the purposes of the FPA, sought rehearing before FERC of its November 2007 Order.

FERC denied this petition in an order issued on May 29, 2009 ("May 2009 Order"). 127 FERC ¶ 61,191, at 61,865, 2009 WL 1508392 (2009). FERC held that it had authority under FPA § 206(b) to "establish[ ] just and reasonable prices in markets operated by jurisdictional public entities (the [CalPX/ISO]), so that [it] may properly order refunds from public utilities." *Id.* at 61,874. In doing so, FERC emphasized that it was "not engaging in impermissible retroactive action with respect to rate changes to previously-accepted jurisdictional tariffs." *Id.* at 61,868. Instead, the November 2000 Order "determined rates charged under the jurisdictional [CalPX/ISO] tariffs to be unjust and unreasonable," and so pursuant to its authority under § 206(b), FERC ordered refunds by jurisdictional sellers. *Id.*

The May 2009 Order also further sought to explain the consistency of FERC's orders with our decision in *Bonneville*, notably in Paragraph 43:

We disagree with the Requesting Parties' assertion that the Clarification Order is inconsistent with the Ninth Circuit's ruling in *Bonneville*. In *Bonneville*, the Ninth Circuit found that the Commission lacked authority to order governmental entities or other non-public utilities to pay refunds. On remand, we are not ordering those entities to pay refunds, rather we are establishing just and reasonable prices in markets operated by jurisdictional public entities (the [CalPX/ISO]), so that we may properly order refunds from public utilities.

*Id.* at 61,874.

Claiming to take up this panel's invitation in *Bonneville*, the California Parties[8] (Respondent-Intervenors here) and others filed contract actions in California state court and the United States Court of Federal Claims against the non-public electricity sellers that prevailed in *Bonneville*. The plaintiffs in those actions seek damages from the non-public utilities (Petitioners here) under the theory that the utilities contractually agreed to abide by the CalPX/ISO market rates, including the rates as subsequently revised by FERC.[9] These actions loom large on the outskirts of this appeal and explain the motivation of most of the parties, but they are not before this court and we do not consider the contract-related arguments.

---

[8]The "California Parties" in the context of this appeal include the State of California, the Public Utilities Commission of California, Pacific Gas and Electric, Southern California Edison, and SDG&E.

[9]The Court of Federal Claims recently ruled that BPA and Western breached contractual duties to pay refunds owed to the California parties resulting from electricity overcharges during the 2000-2001 energy crisis in California. *Pac. Gas & Elec. Co. v. United States*, Nos. 07-157C & 04-167, 2012 WL 1570962 (Fed. Cl. May 2, 2012).

## II.  Petitioners' Standing

Before we reach the scope of FERC's authority to retroactively "revise" the rates charged in the California energy markets, we must deal with two threshold challenges: whether Petitioners have standing to bring the current appeal, and whether this appeal represents an impermissible collateral attack on prior FERC orders. We are persuaded by neither challenge.

The first is an argument that Petitioners lack standing to seek the requested relief. We conclude that Petitioners do have standing.

**[1]** FERC characterizes Petitioners as having "succeeded" in the FERC proceeding, in that FERC did not order that Petitioners must pay refunds. Thus, FERC argues, Petitioners were not injured by the Orders on review. However, FERC's assertion on appeal that it reset the CalPX/ISO rates for all market participants, not only the entities over which it has jurisdiction, results in a sufficiently concrete injury to Petitioners to afford them standing. FERC's action to reset rates in a way that could support a contract action against Petitioners would have an obvious and real impact on them. Petitioners are, therefore, "aggrieved" parties under the FPA and they have standing to seek review of the Orders.

Section 313 of the FPA "limits judicial review to those parties who have been 'aggrieved by an order of the Commission.' " *Port of Seattle*, 499 F.3d at 1028 (quoting 16 U.S.C. § 825*l*(b)). Additionally, a party must meet the constitutional standing requirements of injury-in-fact, redressability, and causation. *See Exxon Mobil Corp. v. FERC*, 571 F.3d 1208, 1219 (D.C. Cir. 2009) (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992)); *Port of Seattle*, 499 F.3d at 1028 (citing *Shell Oil Co. v. FERC*, 47 F.3d 1186, 1200 (D.C. Cir. 1995)). As we noted in *Port of Seattle*, "both aggrievement and standing require that petitioners establish, at a mini-

mum, injury in fact to a protected interest." 499 F.3d at 1028 (internal quotation marks omitted). That injury must be "actual or imminent, not conjectural or hypothetical." *Lujan*, 504 U.S. at 560 (internal quotation marks omitted).

FERC argues that Petitioners fail to demonstrate the requisite injury because they prevailed in the challenged Orders on remand from *Bonneville*, "which absolved them from any liability for a refund under FPA § 206(b)." It is true that "[t]he general rule is that a party may not appeal from a decree in its favor." *Port of Seattle*, 499 F.3d at 1028 (citing *Lindheimer v. Illinois Bell Tel. Co.*, 292 U.S. 151, 176 (1934)). The general rule, however, is subject to exceptions. *Id.*; *see also Camreta v. Greene*, 563 U.S. ___, 131 S. Ct. 2020, 2028-30 (2011). One such exception, applicable here, allows litigants to appeal a favorable result if they continue to have a personal stake in the appeal. *Camreta*, 131 S. Ct. at 2029; *Deposit Guar. Nat'l Bank v. Roper*, 445 U.S. 326, 333-34 (1980).

Petitioners' personal stake is obvious. They have been forced to defend themselves in lawsuits seeking substantial contract damages. Those actions are premised on the FERC Orders challenged here. Counsel for the California Parties, the plaintiffs in the contract actions and Respondents-Intervenors here, conceded that FERC's resetting of the rates charged by the non-jurisdictional entities is the predicate for these pending contract actions. Thus, Petitioners' suit is no "mere disagreement with an agency's rationale for a substantively favorable decision." *See Port of Seattle*, 499 F.3d at 1028. We agree with Petitioners that "[t]here would be something rather askew if standing principles prevented review of agency orders in the one forum where the agency that issued the orders and the parties most aggrieved by those orders can meet to have the agency's defense of its orders heard." Petitioners suffered an injury-in-fact sufficient to meet the standing requirements of FPA § 313, as well as Article III.

FERC challenges Petitioners' standing as resting on specu-
lation regarding the contract action. Several observations dis-
pel that characterization, most notably FERC's vigorous
argument in response to this court's supplemental briefing
order asking the parties about the practical effect of the ruling
in this case. At length, FERC argues that "all market partici-
pants agree by contract to abide by the terms and conditions
of the FERC jurisdictional tariffs and any related FERC rul-
ings." FERC goes on to underscore that all players, including
non-jurisdictional utilities like Petitioners, are "integrated co-
participants" in the market, and argues that an unfavorable
ruling about the scope of § 206(b) could "preclude contract
actions against governmental market participants." FERC's
concern about the outcome of this case underscores the Peti-
tioners' very real stake in the proceeding.

FERC's reliance on *Federal Power Commission v. Hope
Natural Gas Co.*, 320 U.S. 591 (1944), is also not persuasive.
There, the Supreme Court held unreviewable the Federal
Power Commission's ("FPC") finding that certain past rates
were unlawful. *Id.* at 618. The FPC had no authority to order
refunds and could fix rates only prospectively, but it argued
that it nevertheless could make findings as to the lawfulness
of past rates. *Id.* The Court did not reach the merits of this
contention and held that the issue was unreviewable for lack
of standing because the FPC's findings were "only prelimi-
nary, interim step[s] towards possible future action — action
not by the Commission but by wholly independent agencies."
*Id.* at 619. The primary and crucial difference between *Hope*
and this case is that FERC's action here was final and not
contingent on another agency. This situation is quite different
from a scenario "where the order sought to be reviewed does
not of itself adversely affect complainant but only affects his
rights adversely on the contingency of future administrative
action."[10] *Id.* Moreover, the future action that could affect the

_____

[10]Nor is this a case like *Wisconsin Public Power Inc. v. FERC*, 493 F.3d
239, 268 (D.C. Cir. 2007), in which the D.C. Circuit held that cooperatives

impact of the disputed FERC Orders on Petitioners is not action to be taken by another federal administrative agency but rather is the contract litigation proceeding in other courts. If FERC's authority to issue the disputed Orders cannot be challenged here, it does not appear that it could be challenged anywhere. The California appellate courts, for example, would not be a logical or appropriate forum for resolving the scope of FERC's authority. Because Petitioners are aggrieved by FERC's Orders under review, or otherwise retain a sufficient stake in the outcome, they have standing to bring their petition.

## III. Collateral Attack on a Prior FERC Order

The California Parties argue that Petitioners' appeal is an untimely and impermissible collateral attack on FERC's July 2001 Order. They note that although Petitioners sought rehearing and appealed from other aspects of the July 2001 Order, they did not argue on rehearing from that order that FERC could not revise the market clearing price. Section 313 of the FPA provides that "[n]o proceeding to review any order of the Commission shall be brought by any entity unless such entity shall have made application to the Commission for a rehearing thereon," 16 U.S.C. § 825*l*(a), and that "[n]o objection to the order of the Commission shall be considered by the court [on review] unless such objection shall have been urged before the Commission in the application for rehearing unless there is reasonable ground for failure so to do," *id.* § 825*l*(b).

Our jurisdiction under the FPA "is limited to review of new orders. We may not entertain a petition for review that collaterally attacks a prior FERC order." *Pac. Gas & Elec. Co. v.*

---

lacked standing to challenge the FERC orders based on "[a] petitioner's interest in the Commission's legal reasoning and its potential precedential effect." The Petitioner's challenge here is not "uncoupled from any injury in fact caused by the substance of FERC's adjudicatory action." *Id.* (internal quotation marks omitted).

*FERC*, 464 F.3d 861, 868 (9th Cir. 2006). The D.C. Circuit has observed that "[t]he question of whether [a party] is collaterally attacking prior orders depends on whether those orders gave sufficient notice of the rule to which [the party] now objects." *S. Co. Servs., Inc. v. FERC*, 416 F.3d 39, 44 (D.C. Cir. 2005) (internal quotation marks omitted). Similarly, we have stated that "[t]o determine whether a petition for review is barred as a collateral attack on a prior order, we must determine whether the order upon which the petition is based was merely a "clarification" of a prior order, or whether it was a "modification" of a prior order. The latter is reviewable on appeal, while review of the former is barred as an impermissible collateral attack." *Pac. Gas & Elec.*, 464 F.3d at 868. The relevant question is "whether a reasonable party in the petitioner's position would have perceived a very substantial risk that the order meant what the Commission now says it meant." *Id.* (internal quotation marks and alterations omitted).

It is far from clear that a reasonable party in Petitioners' position would have understood that FERC's July 2001 Order meant what the California Parties now say it meant — that FERC was retroactively revising the rates charged by nonjurisdictional sellers during the refund period. It is true that FERC declared in its July 2001 Order that in ordering refunds of all sales on the CalPX/ISO markets its "action . . . revise[d] the market clearing prices that all market participants previously agreed to accept for their sales." 96 FERC ¶ 61,120, at 61,512. FERC sent contradictory signals in the same Order, however, observing that, "[i]n amending FPA Section 206, Congress did not give the Commission authority to modify unjust and unreasonable rates retroactively." *Id.* at 61,505.

In addition to the lack of clarity in the July 2001 Order itself, FERC's later orders did not tell an entirely consistent story. In its October 2007 Order FERC "disagree[d]" with the assertion that "the Commission revised the pricing formulations contained in the [CalPX/ISO] tariffs," and stated that

this panel in *Bonneville* found that "the Commission had ordered refunds *rather than amending the [CalPX/ISO] tariff to reset the market clearing price during the refund period*." 121 FERC ¶ 61,067, at 61,352 (emphasis added). On a petition for rehearing by the California Parties, FERC responded with its November 2007 Order, in which it stated that its October 2007 Order had "inadvertently mischaracterized" both *Bonneville* and its prior orders. 121 FERC ¶ 61,188, at 61,925-26. As detailed above, FERC there amended paragraph 36 of the October 2007 Order. *Id.* at 61,926. If FERC could not keep straight in its own orders what it was doing, other parties cannot be expected to do any better.

**[2]** In sum, FERC's shifting position with regard to its authority to order refunds and to retroactively reset market rates was not mere clarification or even fair notice of its ultimate position. The parties should not be expected to have known to appeal from the July 2001 Order regarding FERC's statutory authority to retroactively reset rates. Because FERC itself read its July 2001 Order, at least initially, as not retroactively resetting rates for non-jurisdictional entities, Petitioners' identical interpretation of that order was surely not unreasonable. The collateral attack doctrine requires that Petitioners timely exercise their rights. It does not require prescience.

## IV. Authority to Retroactively Adjust Rates for Non-Public Entities

Having concluded that Petitioners' claims survive the threshold challenges, we now address the core questions on the merits. We begin with FERC's assertion of broad power under FPA § 206 to retroactively reset rates for all market participants. In reviewing an agency's interpretation of the statute it is charged with administering, we must apply the familiar test established in *Chevron, U.S.A., Inc. v. Natural Res. Def. Council*, 467 U.S. 837, 842 (1984). Here, we conclude, under the first step of that test, that the intent of Con-

gress is clear that § 206 does not grant FERC the broad authority to retroactively reset rates charged by all market participants.

**[3]** Congress has infused FERC with expansive authority over energy markets through the FPA. Section 201 of the FPA grants FERC exclusive jurisdiction over the transmission and sale of electric energy in interstate commerce. 16 U.S.C. § 824(b)(1). Under § 205, Congress gave FERC jurisdiction over the "rates and charges" of "every public utility." 16 U.S.C. § 824d.[11] This section declares unlawful "any . . . rate or charge that is not just and reasonable" and requires public utilities to file their rates with FERC. *Id.* Section 206(a) provides that whenever FERC finds a rate to be unjust and unreasonable, FERC "shall determine the just and reasonable rate . . . to be thereafter observed and in force." 16 U.S.C. § 824e(a). FERC's authority under this provision, however, is limited by being prospective only, and does not permit retroactive adjustments to rates. *City of Anaheim v. FERC*, 558 F.3d 521, 523 (D.C. Cir. 2009) ("On its face, § 206(a) prohibits retroactive adjustments of rates."); *see also Exxon Mobil*, 571 F.3d at 1211 (observing that under § 206(a) "FERC may not retroactively alter a filed rate to compensate for prior over- or underpayments").

**[4]** Congress expanded FERC's authority to address "unjust and unreasonable" rates by adding § 206(b) to the FPA in 1988, over fifty years after the enactment of the original law.[12]

---

[11]In explaining the "public utility" limitation on FERC's jurisdiction in § 205, § 201(f) provides that "[n]o provision in this subchapter shall apply to . . . the United States, a State or any political subdivision of a State . . . or any agency, authority, or instrumentality of any one or more of the foregoing, or any corporation which is wholly owned, directly or indirectly, by any one or more of the foregoing." 16 U.S.C. § 824(f).

[12]Congress added this subsection with the Regulatory Fairness Act of 1988, Pub. L. No. 100-473, 102 Stat. 2299. Until this time, FERC could "only order the rates of public utilities to be reduced prospectively from

Section 206(b) provides that after FERC has determined a rate to be unjust and unreasonable, it "may order refunds of any amounts paid . . . in excess of those which would have been paid under the just and reasonable rate . . . which the Commission orders to be thereafter observed and in force." 16 U.S.C. § 824e(b). To do so, FERC must set a refund effective date. *Id.* In the case of the filing of a complaint, FERC may set the date any time within the five-month period following the filing of the complaint; in the case of a proceeding instituted by FERC, within the five-month period following the publication date of the notice of its intention to initiate the proceeding. *Id.* Finally, § 206(b) sets the refund period as the fifteen months following the refund effective date. *Id.*

**[5]** In its briefing, FERC has asserted that it has the authority to retroactively reset the market rates for all market participants through the exercise of its § 206(b) refund authority over public utilities. We hold that it does not. Although we are sympathetic to FERC's desire to create a market-wide fix for past rates charged that it later found were unjust and unreasonable, § 206(b) simply does not endow FERC with this power. As we previously held in *Bonneville*, FERC's refund authority does not extend to non-jurisdictional governmental entities, such as Petitioners. 422 F.3d at 911, 920.

FERC cites to a number of cases that have characterized its refund authority under § 206(b) involving "retroactive rate change," at least in the colloquial meaning of that phrase. *See, e.g.*, *Exxon Mobil*, 571 F.3d at 1211 (noting § 206(b) "provides a narrow exception" to the rule that "FERC may not retroactively alter a filed rate to compensate for prior over- or

the date of its decision that existing rates [were] unlawful." S. Rep. No. 100-491, at 3 (1988), *reprinted in* 1988 U.S.C.C.A.N. 2584, 1988 WL 169844. The provisions in § 206(b) were added to "give the Commission the discretion to require public utilities to refund amounts paid in excess of just and reasonable rates for certain periods prior to the Commission's decision." *Id.*

underpayments"); *Anaheim*, 558 F.3d at 524 ("And § 206(b) authorizes only retroactive refunds (rate decreases)"); *Sithe New England Holdings, LLC v. FERC*, 308 F.3d 71, 78 (1st Cir. 2002) ("[E]very time that FERC or any comparable agency decides that an existing rate is unjust and orders refunds to buyers for a past period, it is engaging in permissible 'retroactive ratemaking' in a vernacular sense."). But these cases have not addressed whether FERC has the power under FPA § 206(b) to actually retroactively change rates charged by non-jurisdictional sellers. Indeed, there is language in at least one such opinion to suggest that it does not. *See Exxon Mobil*, 571 F.3d at 1215 ("Section 206(a) provides the only mechanism by which FERC can revise established rates.").[13]

Nor was the question of FERC's statutory authority to retroactively revise tariff rates squarely presented to the Eighth Circuit in *Alliant Energy v. Nebraska Public Power District*, 347 F.3d 1046 (8th Cir. 2003), as the California Parties argue. The court in *Alliant* did not once mention the FPA,

---

[13]FERC references similar statements in a line of cases involving § 4 of the Natural Gas Act ("NGA"). 15 U.S.C. § 717. *See E. Tenn. Natural Gas Co. v. FERC*, 863 F.2d 932, 942 (D.C. Cir. 1988) (noting that NGA § 4 "authorizes the Commission to order that the pipeline pay refunds to any customers who purchased gas at the (filed) proposed rate, *thereby retroactively changing that rate*") (emphasis added); *Nw. Pipeline Corp. v. FERC*, 61 F.3d 1479, 1488-89 (10th Cir. 1995) (same); *Natural Gas Pipeline Co. of Am. v. FERC*, 904 F.2d 1469, 1471 (10th Cir. 1990) (same); *Pub. Utils. Comm'n of Cal. v. FERC*, 894 F.2d 1372, 1382-83 n.8. Although "[w]e follow . . . the familiar practice of applying 'interchangeably' judicial interpretations of provisions from the Natural Gas Act to their 'substantially identical' counterparts in the Federal Power Act," *NSTAR Elec. & Gas Corp. v. FERC*, 481 F.3d 794, 800 (D.C. Cir. 2007), NGA § 4 speaks to prospective ratesetting and so is a "substantially identical" counterpart to FPA § 205, not § 206, *see E. Tenn.*, 863 F.2d at 942 n.14. The rates that were "retroactively changed" in this line of NGA cases were the rates *proposed* by sellers and accepted by FERC conditionally pending an investigation prior to final approval. *See, e.g.*, *Nw. Pipeline Corp.*, 61 F.3d at 1488. As such, these decisions do not squarely implicate the FERC Orders now under review.

let alone § 206, because it was "not enforcing the FERC order," but an agreement freely entered into by the parties. *Alliant*, 347 F.3d at 1050. Finally, we did not decide this issue in *Bonneville*, when we observed that "FERC's order *does more than* simply reset the market-clearing price for power in the . . . ISO and CalPX markets," 422 F.3d at 919-20 (emphasis added), and stated that "the remedy, if any, may rest in a contract claim," *id.* at 925.

FERC asserts that its authority to retroactively reset rates for all market participants flows from its § 206(b) authority to order refunds and set a refund effective date. Our rejection of this conclusion derives from the language and structure of the statute. We begin with the overall structure. Section 206 separates the power to set rates in § 206(a) from the power to order refunds in § 206(b). This bifurcation points to the unambiguous congressional decision that these provinces remain distinct. *See Exxon Mobil*, 571 F.3d at 1215 (noting § "206(a) provides the only mechanism by which FERC can revise established rates" and § "206(b) provides the relief FERC may order for amounts paid in excess of the just and reasonable rate"). Section 206(a), not § 206(b), authorizes FERC to set rates and, as discussed above, it does not permit retroactive ratesetting. *See Anaheim*, 558 F.3d at 522. Had Congress intended to give FERC such expansive authority, it would have said so. *See Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 468 (2001) ("Congress, we have held, does not alter the fundamental details of a regulatory scheme in vague terms or ancillary provisions — it does not, one might say, hide elephants in mouseholes.").

If FERC's greater power to order refunds included the lesser power to reset market rates, the jurisdictional reach of the two powers should logically be coextensive. However, FERC's refund authority applies only to jurisdictional entities as we held in *Bonneville*, 422 F.3d at 911; it does not extend to the entire market, which includes non-jurisdictional entities. In fact, FERC's initial assertion of the authority to retro-

actively revise prices on a market-wide basis *was* joined to its assertion to order refunds from all market participants. *See* 96 FERC ¶ 61,120, at 61,512. When we rejected the latter assertion of authority in *Bonneville*, the former assertion remained intact, but awkwardly so, without its original reason for existence. FERC does not attempt to explain what it would mean to have the authority to "reset" rates without ordering a refund.[14]

FERC maintains that our interpretation reads § 206(b) out of the statute entirely, because it must be able to retroactively reset rates to enable it to order refunds under § 206(b). *See* 127 FERC ¶ 61,191, at 61,868-69. But FERC is free to determine the just and reasonable rates retroactively, without resetting the rates for all market participants, as it has done in the past. *See, e.g., Exxon Mobil*, 571 F.3d at 1215-16 (explaining refund calculation methodology, which does not include retroactively resetting rates for all market participants).

In short, we conclude that FPA § 206(b) is not ambiguous: While FERC has the authority to state retroactively what a "just and reasonable" rate would have been pursuant to its refund authority, Congress did not provide FERC with retroactive ratesetting authority over non-jurisdictional sellers.

---

[14]FERC's initial claim that it has the authority to retroactively revise the market clearing prices in its July 2001 Order is best understood as a justification for FERC's imposition of refund liability on non-jurisdictional, non-public entities. *See* 96 FERC ¶ 61,120, at 61,512. In *Bonneville*, we described FERC's statement that it was revising the market clearing prices as an "attempt[ ] to deflect our attention away from the fact that it is ordering refunds from the Public Entities," the non-public utilities over which it lacked jurisdiction. 422 F.3d at 919. FERC's holding on that point needed all the help it could get: two members of the Commission described the conclusion as "breathtaking," observing that it would "come as a shock to most observers." 96 FERC ¶ 61,120, at 61,523 (Breathitt and Massey, Comm'rs, dissenting in part). It appears then that in its July 2001 Order FERC did not truly believe it needed to reset the market rates to be able to order refunds, but characterized its actions as revising the market rate to obfuscate the implication of its holding regarding its refund authority.

FPA § 206 attests to congressional intent to maintain a separation between FERC's authority to set a just and reasonable rate under § 206(a) and its ability to order refunds under § 206(b). Because Congress spoke with clarity in § 206, we need not progress to the second step of the *Chevron* inquiry to determine whether, in the face of statutory ambiguity, FERC's interpretation of the statute on appeal is a reasonable one. *See Chevron*, 467 U.S. at 843 ("[I]f the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute.").

## V.  The Specific Orders at Issue

[6] Although we are not persuaded by the argument on appeal that FERC's power is more expansive (an argument that we think was presented more forcefully by the California Parties than by FERC itself), the Orders under review do not directly contravene our more limited understanding of § 206. The July 2001 Order "reset" the market clearing prices in the CalPX and ISO spot markets during the refund period to just and reasonable levels for the purpose of calculating the amount of refund due from entities over which FERC had authority. *See PUC of California*, 462 F.3d at 1052. This calculation necessarily involved reevaluating the price previously charged by all market participants because the market clearing price was the same for all of them:

> Our action here establishes a *revised method for calculating the just and reasonable clearing prices* to be applied in those markets for the period beginning October 2, 2000. This is pursuant to the Commission's authority under FPA Section 206 to fix the just and reasonable rate. Our action thus revised the market clearing prices that all market participants previously agreed to accept for their sales.

96 FERC ¶ 61,120, at 61,512 (emphasis added). FERC needed to determine those just and reasonable clearing prices in order to calculate refunds from jurisdictional entities.

The post-*Bonneville* Orders now under review are read by the dissenting opinion to invoke only a more expansive authority to retroactively reset the rates "observed and in force" from all market participants. We think the language of the Orders can and should be read more modestly. The primary focus of the Orders was on the fair and reasonable clearing prices, not on which parties would be affected by the Orders. On the latter subject, it may have taken FERC a few tries to clarify what it meant, as outlined above at 9659-61, but in the May 2009 Order FERC clearly acknowledged that it did not have authority to order refunds from the non-public utilities and explained that it was establishing just and reasonable rates in order to determine the appropriate refund amount for public entities:

> We disagree with the Requesting Parties' assertion that the Clarification Order is inconsistent with the Ninth Circuit's ruling in *Bonneville*. In *Bonneville*, the Ninth Circuit found that the Commission lacked authority to order governmental entities or other non-public utilities to pay refunds. On remand, we are not ordering those entities to pay refunds, rather we are establishing just and reasonable prices in markets by jurisdictional entities (the [CalPX/ISO]), so that we may properly order refunds from public utilities.

127 FERC ¶ 61,191, at 61,874.

**[7]** Like our dissenting colleague, we reject the argument that FERC has an expansive statutory authority to retroactively reset rates. But that does not mean that we have to disregard the Order that FERC actually entered. It is simply not the case that we have put words into FERC's mouth — or as

expressed by the dissenting opinion, at 9677, that "we just don't think [FERC] said what [it] said." To the contrary, we have attributed to FERC exactly the position that it expressed in its May 2009 Order, as quoted above.

That an argument has been presented on appeal for broader FERC power does not mean that FERC had no power whatsoever. The core of our disagreement with the dissenting opinion may be reflected in its own summary: "a review of the orders, followed by FERC's litigation position, shows that FERC did more than passively determine just prices en route to ordering refunds for jurisdictional entities. It *also* sought to retroactively reset market rates for *all* entities through those orders, without the necessary legal authority." Dissenting opinion, at 9678 (emphasis in original). But the fact that FERC did not have the authority to do what it "also" might have tried to do does not mean that it did not have the power to do what it did in "passively" determining just prices en route to ordering refunds only from jurisdictional entities.

We are not blind to the potential impact of FERC's determination of the just and reasonable prices. In the contract actions brought in other forums, it is claimed that the Petitioners before us are liable for charges collected by them in excess of the just and reasonable prices subsequently calculated by FERC. Petitioners seek to protect themselves against those claims by preventing FERC from recalculating the market rates. But FERC's recalculation was not an empty exercise, because it had to determine just and reasonable market clearing prices in order to calculate the refunds to be ordered from sellers from which it could order refunds. What impact this calculation might have on the contract actions pending in other courts is not for us to say. FERC has not treated those claims as an infringement upon FERC's regulatory authority, so we do not see need to treat them as such.

**VI.    Conclusion**

**[8]** As we hold that FERC did not exceed its authority in issuing the Orders under review, the petitions for review are DENIED.

**PETITIONS FOR REVIEW DENIED.**

---

McKEOWN, Circuit Judge, dissenting:

The Federal Power Act's ("FPA") delineation of FERC's authority under § 206(b) is unambiguous: FERC lacks the "broad power under FPA § 206 to retroactively reset rates for all market participants." Maj. Op. 9667. From this rejection of FERC's position, the end of the line seems clear—FERC's orders exceeded its authority by resetting market rates retroactively, and the petition should be granted. Apparently not so. In a surprise twist ending, notwithstanding the plain language of the orders at issue and FERC's litigation position, the majority determines that FERC merely declared fair market clearing prices without actually attempting to "retroactively alter" these prices. Maj. Op. at 9673-75. This semantic resolution is at odds with the record and basic principles of administrative law, and undermines the majority's standing analysis, endangering the utilities' claim to standing.

To understand why the majority's conclusion takes a wrong turn, it is helpful to step back and track FERC's bidding in this multi-year saga. FERC has stated throughout these proceedings that it has reset rates retroactively, and claims authority to do so under § 206(b) of the FPA. It argues that a contrary interpretation reads § 206(b) out of the statute entirely, because FERC must be able to retroactively reset rates to enable it to order refunds under § 206(b). A careful reading of FERC's orders also shows that it sought to reset market rates. *See, e.g.*, 127 FERC ¶ 61,869 ("[T[he ordering

of refunds by its very nature involves the resetting of rates in a past period."). The majority's effort to candy coat and recategorize what FERC said is inconsistent with the scope of our review of these administrative agency orders. In effect, the majority is saying "We know what your position is, we know what you argued on appeal, and we read what you wrote, but never mind, we just don't think you said what you said." That can't be right. Although I join parts I-IV of the opinion, I cannot endorse the majority's ultimate conclusion. I respectfully dissent.

## A. Federal Power Act, § 206

Before turning to what FERC actually *did* do, it is important to recognize what FERC *may* do under the statute. Under FPA § 206, from which FERC's (legal) power flows, FERC may "determine the just and reasonable rate . . . to be thereafter observed and in force." 16 U.S.C. § 824e(a). Subsection 206(b) outlines FERC's retroactive authority. FERC must first "show that [a] rate" charged during a particular period "is unjust, unreasonable, unduly discriminatory, or preferential." Upon making this showing, it "may order refunds of any amounts paid" over a particular period. § 206(b).

Under both sections, FERC's first step is to "determine" the appropriate rate, and relatedly, that an alternative rate is unjust. At that point, FERC takes steps to implement the appropriate rate. Under § 206(a), FERC has the prospective authority to set the rate as the market rate "thereafter observed and in force." Under § 206(b), FERC has the retroactive authority to order refunds based on its determination. As the majority correctly determines, the ratesetting authority is distinct from the refund authority and has prospective application only. Thus, under the statute, FERC may engage in three types of actions: the prospective and retroactive determination of a fair market price, prospective setting of market rates "in force" based on that price, and the retroactive ordering of refunds. Maj. Op. at 9672-73. Nowhere in § 206 did Congress

grant FERC the ability to retroactively reset market rates. FERC's approach, which is to cherry pick a little from both subsections of the statute, creates an unprecedented and unauthorized option—retroactive resetting of rates.

## B. FERC's Orders

Having correctly read the statute, the majority holds that FERC was merely "calculat[ing]" the just and reasonable market prices, rather than attempting to reset rates in the orders on appeal. Maj. Op. at 9673. As the discussion of the collateral order doctrine suggests, FERC's orders were hardly a model of clarity. Maj. Op. 9665-67. However, a review of the orders, followed by FERC's litigation position, shows that FERC did more than passively determine just prices en route to ordering refunds for jurisdictional entities. It *also* sought to retroactively reset market rates for *all* entities through those orders, without the necessary legal authority. In so doing, FERC exceeded its power under the statute.

It is useful to trace the orders with care. From the outset, FERC has suggested that it sought to reset market rates. In its 2001 order, which we reviewed in *Bonneville Power Administration v. FERC*, 422 F.3d 908 (9th Cir. 2005), FERC headlined the issue:

> Our action here establishes a revised method for calculating the just and reasonable clearing prices to be applied in those markets for the period beginning October 2, 2000. This is pursuant to the Commission's authority under FPA Section 206 to fix the just and reasonable rate. *Our action thus revised the market clearing prices that all market participants previously agreed to accept for their sales.*

96 FERC ¶ 61,120, at 61,512 (emphasis added).[1] In citing the

---

[1] It is true that "FERC sent contradictory signals in the same Order," by noting that "[i]n amending FPA Section 206, Congress did not give the

same passage, the majority emphasizes only the sentence concerning *"calculating* the just and reasonable clearing prices," Maj. Op. at 9673; this initial step does not vitiate FERC's attempt to *reset* the prices for all participants. Indeed, the California parties contend that the 2001 Order so clearly retroactively *reset* rates that the petitioners should have challenged the rate reset at that time, and that this appeal is an impermissible collateral attack on the 2001 Order.

Although the quoted passage concerned a 2001 decision and petitioners here challenge only orders issued post-*Bonneville*, bygones cannot be bygones. The first of FERC's post-*Bonneville*'s orders does not pose a problem. In October 2007, FERC "vacate[d] each of the Commission's orders," including the 2001 order at issue in *Bonneville*, "to the extent that they order non-public utility entities to pay refunds" in compliance with *Bonneville*. *San Diego Gas & Elec. Co. v. Sellers of Energy & Ancillary Svcs.,* 121 FERC ¶ 61,067, at 61,352 (2007). Had matters ended there, the order may have passed muster.

However, at the instigation of the California parties who had brought contract claims against the petitioners, FERC clarified its order the following month. Without mincing words, in its November 2007 Order, FERC explained:

> We agree with the California Parties that the Commission inadvertently mischaracterized both its prior orders and the Ninth Circuit's decision in Bonneville. [E]stablishing a just and reasonable rate is a prerequisite for ordering refunds. Accordingly, the

Commission authority to modify unjust and unreasonable rates retroactively." 96 FERC ¶ 61,120, at 61,505. Maj. Op. at 9666. However, just because FERC contradicted itself as to whether it sought to retroactively reset rates, it does not follow that all FERC did was *determine* rates, as the majority holds.

Commission made clear that it was resetting the market clearing prices in the [2001] Refund Order:

> Our action here establishes a revised method for calculating the just and reasonable clearing prices to be applied in those markets [the CAISO and PX wholesale electricity markets] for the period beginning October 2, 2000. This is pursuant to the Commission's authority under FPA section 206 to fix the just and reasonable rate. *Our action thus revises the market clearing prices that all market participants previously agreed to accept for their sales.*

*San Diego Gas & Elec. Co. v. Sellers of Energy & Ancillary Svcs.,* 121 FERC ¶ 61,188, at 61,925 (2007) (emphasis in original). Nor was this unambiguous position merely a passing observation in the order. FERC performed an exegesis of *Bonneville*, claiming that what offended the court was only that FERC "*went beyond resetting the market clearing prices.*" *Id.* at 61,926 (emphasis in original) (citing *Bonneville*, 422 F.3d at 919). Thus, although the November Order did not explicitly amend the October Order to insert language regarding the resetting of market rates, *id.,* the order went out of its way to reaffirm the vitality of language from the 2001 Order that stated that FERC retroactively reset market rates for all participants.

Faced with what they perceived as a turnabout by FERC, petitioners asked FERC to reconsider. Not only did FERC deny the request, but reemphasized that it had the power to reset market clearing prices, claiming more than once that the retroactive "application during that period of the new rate determined by the Commission to be just" was essential to its refund authority. 127 FERC ¶ 61,191, at 61,869 and 61,872 (2009); *id.* at ¶ 61,869 ("[T]he ordering of refunds by its very nature involves the resetting of rates in a past period."). FERC

did not conflate determining rates, resetting market prices based on those rates, and ordering refunds: as it explains, "[a]bsent our *resetting* of rates during the refund period, we would be unable *to determine* what amount would be in excess of a just and reasonable rate, and, therefore, we would be incapable of [ordering refunds]." *Id.* (emphasis added).

FERC does not explain why, after it "determine[s]" a rate to be just, it cannot simply order a refund, without retroactively applying the rate.[2] But the orders speak for themselves, and belie the majority's claim that "the language of the Orders can and should be read more modestly." Maj. Op. at 9674.

Modesty aside, the majority's approach sidesteps a plain reading of the orders. The majority quotes from a passage in the 2009 Order, in which FERC claimed that it was merely "establishing just and reasonable prices in markets *by jurisdictional entities*." Maj. Op. at 9674 (quoting 127 FERC at 61,874) (emphasis added). However, FERC proceeded to "reject" the distinction between "calculating rates for jurisdictional sellers" and "establishing a single just and reasonable price" for the market, and repeatedly held that its orders and statutory market-reset authority extended to "*all* spot market sales." 127 FERC at 61,875, 61,872, 61,874 (emphasis added). FERC held that its prior orders would "necessarily affect all sales including sales by governmental entities and other non-public utilities." *Id.* at 61,873.

Our ruling must begin and end with the language of the orders—unlike in a typical summary judgment appeal from a district court, we cannot affirm on any ground, nor may we substitute our view for that of the agency. The majority opinion "implies that if the administrative [agency] opinion consisted of two words—'[petition] denied'—a persuasive

---

[2] As the majority notes, FERC explained that it may "establish[ ] just and reasonable prices in markets by jurisdictional entities . . . so that we may properly order refunds from public utilities." 127 FERC at ¶ 61,874.

[judicial opinion] could substitute for the missing agency reasoning. That is incorrect." *Spiva v. Astrue*, 628 F.3d 346, 353 (7th Cir. 2010) (Posner, J.). Under long standing administrative law principles, "the reviewing court should not attempt itself to make up for any deficiencies in the agency's reasoning." *California Trout v. FERC*, 572 F.3d 1003, 1021 (9th Cir. 2009) *(quoting Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (citing *SEC v. Chenery Corp.*, 332 U.S. 194, 196 (1947))) (alterations omitted). As the Court explained in *Chenery*, by displacing FERC's reasoning with our own, we usurp its delegated authority, and "propel the court into the domain which Congress has set aside exclusively for the administrative agency." 332 U.S. at 196. The *Chenery* principle also ensures that agencies provide reasoned explanations for their decisions, which in turn, are the precondition for judicial deference in other administrative contexts. *See id.*; *Spiva*, 628 F.3d at 353; *see generally* Kevin M. Stack, *The Constitutional Foundations of* Chenery, 116 Yale L.J. 952, 1021 (2007).

*Chenery* requires us to hold FERC to its own words. Resolution of this appeal requires no nuanced interpretation of the orders, just allegiance to plain English. Because the FERC orders clearly seek to go beyond its statutory authority— retroactively resetting rates for all market sales—I would grant the petition.

## C.   FERC's Argument on Appeal

Whatever other criticism is leveled at FERC's approach, it cannot be faulted for a lack of consistency. On appeal, keeping faith with *Chenery*, FERC echoes its orders and maintains again and again in its brief that those orders "*revise[d] the market clearing prices that all market participants previously agreed to accept for their sales*," and then seeks to defend this position. The majority itself recognizes the "argument on appeal that FERC's power is more expansive," allowing FERC to retroactively reset rates. Maj. Op. at 9673. FERC

also accepts the government utilities' characterization of the dispute as involving retroactive rate resetting, arguing, in fact, that it engaged in this resetting and has the power to do so. In its brief, FERC actually disagreed with petitioners' claim that FERC did not "reset the rates previously charged." *See* 127 FERC at 61,870 (disagreeing with petitioners claim that "tariff changes are not backdated"). By adopting this position on appeal, FERC surely waives any argument to the contrary. *Koerner v. Grigas*, 328 F.3d 1039, 1048 (9th Cir. 2003) ([A]n issue not "specifically and distinctly argue[d] in [a plaintiff 's] opening brief," is waived.).

In the face of FERC's position, it seems odd indeed for the majority to craft a position that even FERC does not endorse. In resolving this case in favor of FERC, the majority gives short shrift to basic tenets of administrative law and principles of appellate practice.

## D. Standing

The majority's position renders precarious its ruling as to the petitioners' standing. The FPA "limits judicial review to those parties who have been 'aggrieved by an order of the Commission.' " *Port of Seattle v. FERC*, 499 F.3d 1016, 1028 (9th Cir. 2007) (quoting 16 U.S.C. § 825*l*(b)). A party must also meet the constitutional standing requirements of injury-in-fact, redressability, and causation. *Exxon Mobil Corp. v. FERC*, 571 F.3d 1208, 1219 (D.C. Cir. 2009) (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992)).

Petitioners' status as aggrieved parties under the Act, and the concreteness of their injury, all come down to whether FERC's orders had a retroactive effect on the petitioners. If, however, FERC simply calculated just prices, without taking any action with respect to the petitioners, the concreteness of their injury is open to question. The majority concedes as much: "FERC's assertion on appeal that *it reset the CalPX/ISO rates for all market participants*, *not only the enti-*

*ties over which it has jurisdiction*, results in a sufficiently concrete injury to petitioners to afford them standing." Maj. Op. at 9662 (emphasis added).

Without this concrete injury, the majority's ruling on standing is on shaky ground. In *Federal Power Commission v. Hope Natural Gas Co.*, 320 U.S. 591 (1944), the Supreme Court held that the Federal Power Commission's finding that certain past rates were unlawful was unreviewable. *Id.* at 618. The Commission had no authority to order refunds and could fix rates only prospectively, but nevertheless it argued that it could make findings as to the lawfulness of past rates. *Id.* The Court did not reach the merits of this contention because the findings were "only preliminary, interim step[s] towards possible future action—action not by the Commission but by wholly independent agencies," and therefore standing was lacking. *Id.* at 619. Just as in *Hope*, the petitioners' injury is not the result of any action by FERC; rather, it depends completely on how California state courts read the preclusive effect of FERC orders, which, as we have noted, are convoluted at best, and self-contradictory at worst. There is simply no daylight between this situation and one "where the order sought to be reviewed does not of itself adversely affect complainant but only affects his rights adversely on the contingency of future administrative" —or in this case, judicial— "action." Maj. Op. 9664 (citing *Hope*, 320 U.S. at 619). Because I read the FERC orders as imposing an injury directly upon the petitioners by retroactively resetting their market rates, I agree with the majority that there is no standing problem, but of course for a different reason.

Finally, the majority suggests that it is possible to ignore the fact that FERC engaged in impermissible rate resetting because FERC also engaged in permissible rate calculation. Maj. Op. 9675. This "see no evil" approach is at odds with *both Chenery* as well as common sense. As our standing analysis shows, the petitioners challenge and are injured by the rate resetting; it is this action they challenge on appeal. We

cannot ignore the point of the litigation simply because there is a silver lining to the otherwise dark cloud of *ultra vires* FERC action. Because the orders also violate FERC's authority under § 206 of the FPA I respectfully dissent.