# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

---

Argued January 19, 2022        Decided July 26, 2022

No. 20-5174

WATERKEEPER ALLIANCE, INC., ET AL.,
APPELLANTS

v.

MICHAEL S. REGAN, ADMINISTRATOR, U.S. ENVIRONMENTAL
PROTECTION AGENCY, IN HIS OFFICIAL CAPACITY, ET AL.,
APPELLEES

---

Appeal from the United States District Court
for the District of Columbia
(No. 1:18-cv-02230)

---

*Jennifer Cassel* argued the cause for appellants. With her on the briefs was *Charles McPhedran*.

*Robert J. Lundman*, Attorney, U.S. Department of Justice, argued the cause for federal appellees. With him on the brief were *Todd Kim*, Assistant Attorney General, *Jennifer Scheller Neumann* and *Tsuki Hoshijima*, Attorneys, and *Laurel Celeste*, Senior Attorney, U.S. Environmental Protection Agency. *Rebecca Jaffe* and *Katelin Shugart-Schmidt*, Attorneys, U.S. Department of Justice, entered appearances.

*Mithun Mansinghani*, Solicitor General, Office of the Attorney General for the State of Oklahoma, argued the cause for intervenors State of Oklahoma, et al. in support of appellees. With him on the brief were *Douglas H. Green*, *Margaret K. Fawal*, *Megan H. Berge*, *Kent Mayo*, and *Martha S. Thomsen*.

Before: SRINIVASAN, *Chief Judge*, WILKINS and WALKER, *Circuit Judges*.

Opinion for the Court filed by *Chief Judge* SRINIVASAN.

SRINIVASAN, *Chief Judge*: Coal-fired power plants produce considerable amounts of waste known as coal ash. Because coal ash contains carcinogens and other toxic chemicals, its improper disposal can substantially harm the environment and impair the health of anyone living near disposal facilities.

In 2015, the Environmental Protection Agency established federal standards for coal ash disposal facilities. Under the governing statute, a state, instead of submitting to federal oversight of coal ash facilities within its borders, can develop its own permitting program and seek EPA's approval of the state program as consistent with federal standards.

Oklahoma chose that path and obtained EPA's approval of its permitting program. Plaintiffs, a trio of environmental groups, then brought this action contesting EPA's approval. They challenge the adequacy of Oklahoma's permitting program on several grounds. The district court granted summary judgment to EPA on most of the claims, and plaintiffs now appeal.

We do not reach the merits of the claims before us because we conclude that plaintiffs lack standing to bring them. We thus vacate the district court's grant of summary judgment to EPA and remand for dismissal of the relevant claims.

I.

A.

The Resource Conservation and Recovery Act (RCRA), 42 U.S.C. § 6901 *et seq.*, addresses the generation, transportation, treatment, storage, and disposal of solid waste. *See id.* § 6902. Subtitle C of the statute, *id.* §§ 6921–6939g, governs the regulation of hazardous waste, and Subtitle D, *id.* §§ 6941–6949a, governs the regulation of non-hazardous waste.

Of relevance here, RCRA contains a provision addressed to public participation in programs established under the statute. *Id.* § 6974(b). That provision calls for the EPA Administrator, working in cooperation with states, to provide for "[p]ublic participation in the development, revision, implementation, and enforcement" of RCRA programs, and to "develop and publish minimum guidelines for public participation in such processes." *Id.* § 6974(b)(1). RCRA also contains a citizen-suit provision. *Id.* § 6972. That provision authorizes actions against "any person . . . alleged to be in violation of any . . . requirement, prohibition, or order which has become effective pursuant to" the statute, as well as actions against the EPA Administrator for failure to perform a nondiscretionary duty imposed by the statute. *Id.* § 6972(a)(1)(A), (a)(2).

After RCRA's enactment in 1976, EPA for decades considered whether and how to regulate the handling and disposal of coal ash (also known as coal residuals). *See*

*generally Util. Solid Waste Activities Grp. v. EPA (USWAG)*, 901 F.3d 414, 419-24 (D.C. Cir. 2018). Eventually, in 2015, EPA adopted a rule regulating coal ash as non-hazardous waste under Subtitle D of RCRA. *See id.* at 424; Hazardous and Solid Waste Management System; Disposal of Coal Combustion Residuals from Electric Utilities, 80 Fed. Reg. 21,302 (Apr. 17, 2015) (2015 Rule), J.A. 104. The 2015 Rule "set[s] forth guidelines on where and how disposal sites for [coal ash] are to be built, maintained, and monitored," and establishes "minimum criteria for the disposal of [coal ash] in landfills and surface impoundments." *USWAG*, 901 F.3d at 424. The Rule, however, does not establish a federal permitting program or otherwise provide for EPA enforcement of its standards. *See* 2015 Rule, 80 Fed. Reg. at 21,309, J.A. 106.

One year after EPA adopted the 2015 Rule pursuant to RCRA Subtitle D, Congress amended Subtitle D in the Water Infrastructure Improvements for the Nation Act (Improvements Act). Pub. L. No. 114-322, 130 Stat. 1628, 1736–40 (codified at 42 U.S.C. § 6945(d)). The Improvements Act adds provisions to Subtitle D that are specifically addressed to "coal combustion residuals units," i.e., coal ash disposal units. The new provisions expressly build on—and repeatedly reference—the coal ash regulations that had recently been promulgated in the 2015 Rule. *See* 42 U.S.C. § 6945(d); *USWAG*, 901 F.3d at 426.

Under Subtitle D as amended by the Improvements Act, states have a choice about the regulation of coal ash disposal units within their borders. A state can either develop its own permitting program for in-state facilities or instead submit to federal oversight and regulation. *See* 42 U.S.C. § 6945(d)(1), (d)(2).

A participating state—a state that chooses the former route—must submit its permitting program for approval by the EPA Administrator. *See id.* § 6945(d)(1). And the Administrator "shall approve" a state permitting program if the state program's standards "are at least as protective as the criteria" in the 2015 Rule. *Id.* § 6945(d)(1)(C).

For "nonparticipating states," the Improvements Act directs the EPA Administrator to "implement a [federal] permit program to require each coal combustion residuals unit located in [a] nonparticipating State to achieve compliance with applicable criteria established by" the 2015 Rule "or successor regulations." *Id.* § 6945(d)(2)(B). That obligation, however, is "subject to the availability of appropriations specifically provided . . . to carry out a program in a nonparticipating State." *Id.* EPA has yet to adopt a federal permitting program for nonparticipating states as of the date of this opinion.

Soon after Congress enacted the Improvements Act, Oklahoma developed and submitted a coal ash disposal unit permitting program for approval by EPA. The Oklahoma Program grants operating permits to facilities that meet a set of state standards that are designed to mirror or be more protective than the 2015 Rule. Two features of the Oklahoma Program are particularly relevant to this case.

First, Oklahoma provides for varying levels of public participation in connection with permitting actions depending on the "tier" to which a given action is assigned. Okla. Admin. Code § 252:4-7-58 to 4-7-60; J.A. 249. Actions in the highest tier (Tier III) afford the greatest opportunity for public participation, including an opportunity for public meeting and comment and for an administrative hearing. Actions in the lowest tier (Tier I) allow for the fewest opportunities for public participation, including no opportunity for public comment.

*See* Oklahoma: Approval of State Coal Combustion Residuals Permit Program, 83 Fed. Reg. 30,356, 30,358–59 (June 28, 2018), J.A. 168–69; Okla. Stat. tit. 27A, § 2-14-103(9)-(11) (2020).

Second, the Oklahoma Program provides for permits for the "life" of a unit, or until the facility ceases or suspends operations. Okla. Admin. Code § 252:517-3-1. Those permits are subject to state laws and rules "as they exist on the date of filing an application and afterwards as changed." *Id.* § 252:4-7-3. In practice, that means a permit for "life" may need to be modified or re-issued to remain up to date with state criteria. But the permits are not tied to changes in applicable *federal* standards.

In January 2018, EPA provided notice of its intent to approve the Oklahoma Program. The plaintiffs in this action submitted comments in opposition. They contended, among other things, that EPA could not lawfully approve the Oklahoma Program before fulfilling its obligation under RCRA's public-participation provision to promulgate public-participation guidelines for state permitting programs, *see* 42 U.S.C. § 6974(b); that Oklahoma provided insufficient opportunities for the public to participate in Tier I permitting actions; and that the issuance of lifetime permits contravened the Improvement Act's requirement that state programs be at least as protective as federal standards, *see id.* § 6945(d)(1)(C).

In June 2018, EPA approved the Oklahoma Program. Oklahoma has since adopted regulations cementing its program under state law.

## B.

Following EPA's approval of the Oklahoma Program, three environmental groups—Waterkeeper Alliance, Local

Environmental Action Demanded Agency, and Sierra Club—sued the EPA Administrator in the district court. The State of Oklahoma and various utility companies intervened on behalf of EPA.

The complaint raises seven claims. The first is brought under RCRA's citizen-suit provision. 42 U.S.C. § 6972(a)(2). That claim (the citizen-suit claim) contends that RCRA's public-participation provision, 42 U.S.C. § 6974(b), imposes a nondiscretionary duty on the EPA Administrator to promulgate regulations establishing guidelines for public participation in state coal ash programs. As relief, the citizen-suit claim seeks an order compelling the Administrator to issue the ostensibly necessary regulations.

Next, the complaint raises a series of challenges under the Administrative Procedure Act to EPA's approval of the Oklahoma Program. The first of those claims is not part of this appeal: it successfully challenged the Oklahoma Program's allowance of unlined surface impoundments, and EPA has not appealed the district court's ruling against it on that claim.

The second APA challenge reframes the previously described citizen-suit claim. That challenge (the guidelines claim) alleges that EPA's approval infringed RCRA's public-participation provision because it occurred before the Administrator promulgated regulations with public participation guidelines for state permitting programs.

The third APA challenge (the Tier I claim) contends that EPA's approval was inconsistent with RCRA's public-participation provision for a second reason: the Oklahoma Program allows for insufficient public-participation opportunities in Tier I permitting actions.

The fourth APA challenge (the lifetime-permits claim) alleges that EPA's approval of a program with lifetime permits contravened the Improvement Act's requirement that a state permitting program secure compliance with standards at least as protective as the 2015 Rule. Plaintiffs argue that facilities with lifetime permits would cease to comply with federal standards upon any amendment of those standards.

In the fifth and sixth APA claims (the comments claims), the complaint challenges EPA's approval as arbitrary and capricious because EPA failed to adequately respond to two of plaintiffs' comments. The first comment had presented the argument underlying the guidelines claim, and the second had presented the argument underlying the lifetime-permits claim.

The parties cross-moved for summary judgment. Apart from the one claim on which the district court granted judgment to the plaintiffs (which, as explained, involved Oklahoma's allowance of unlined surface impoundments), the court granted judgment in favor of EPA. Plaintiffs now appeal the ruling against them on those remaining six claims.

II.

Although neither EPA nor Intervenors contest plaintiffs' standing to bring the claims before us in this appeal, we have an independent obligation to assure ourselves of our jurisdiction. *See Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 95 (1998). Plaintiffs are a trio of membership organizations. "[A]n association has standing to bring suit on behalf of its members when: (a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Hunt v.*

9

*Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977). The first of those conditions is dispositive here.

A member of the plaintiff organizations would have standing to sue in her own right if: (i) she "suffered an injury in fact . . . which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical"; (ii) the injury is "fairly traceable to the challenged action of the defendant"; and (iii) it is "likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992) (citations, alterations, and quotation marks omitted).

Plaintiffs bear the burden to establish the elements of standing. *Id.* at 561. Because standing is a claim-specific inquiry, *see DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 352 (2006), we separately examine plaintiffs' standing as to each of the claims they raise on appeal. They fail to demonstrate their standing to bring any of those claims.

A.

We start with plaintiffs' citizen-suit claim. That claim, as noted, alleges that the EPA Administrator has failed to satisfy a nondiscretionary duty under RCRA's public-participation provision to adopt regulations setting guidelines for public participation in state coal ash programs. *See* 42 U.S.C. § 6974(b). As relief, the claim seeks an order compelling the Administrator to issue those regulations.

Plaintiffs lack standing to bring that claim because they fail to show that the requested relief would likely redress their alleged injuries. *See Lujan*, 504 U.S. at 561. They assert that their members suffer injury from the dearth of public-participation opportunities afforded by the Oklahoma Program. The members believe that, if they were better heard about how

"coal ash pollution affects [them]," the relevant government actors might act in a way that would "prevent or reduce their injuries from coal ash" in Oklahoma. Plaintiffs' Br. 20, 23. But whereas plaintiffs' injuries thus stem from the *Oklahoma Program*'s ostensible lack of meaningful public-participation opportunities, their claim seeks relief against the *EPA Administrator*, in the form of an order directing the Administrator to issue minimum guidelines for public participation in state permitting programs. EPA's role in plaintiffs' injuries, then, rests on the effect of the agency's actions or inactions on Oklahoma's choices.

When "causation and redressability . . . hinge on the response of the regulated (or regulable) third party to the government action or inaction," standing is "substantially more difficult to establish." *Lujan*, 504 U.S. at 562. The plaintiff must allege "facts . . . sufficient to demonstrate a substantial likelihood that the third party directly injuring the plaintiff would cease doing so as a result of the relief the plaintiff sought." *Renal Physicians Ass'n v. U.S. Dep't of Health & Hum. Servs.*, 489 F.3d 1267, 1275 (D.C. Cir. 2007).

Here, plaintiffs must show that the relief they seek, which would direct *EPA* to issue guidelines for public participation in state permitting programs, would be substantially likely to cause *Oklahoma* to cease its injurious conduct. Plaintiffs fail to carry that burden. They point to nothing in RCRA's framework indicating that our granting them relief on their citizen-suit claim would bring about any changes in the Oklahoma Program's public-participation regime. EPA already approved the Oklahoma Program, and plaintiffs do not explain how the agency's prospective promulgation of public-participation guidelines might retroactively alter that prior approval. Nor do plaintiffs explain how the agency could otherwise enforce the new federal regulations in Oklahoma.

To be sure, EPA can withdraw approval of a state permitting program. 42 U.S.C. § 6945(d)(1)(E). But plaintiffs make no suggestion that EPA, upon adopting new public-participation guidelines, would proceed to withdraw its approval of the Oklahoma Program.

The absence of any such suggestion by plaintiffs is understandable. RCRA contemplates withdrawal of approval of a state program only on specific grounds: for the program's failure to secure compliance with criteria in the 2015 Rule and successor regulations promulgated under EPA's authority to regulate coal ash disposal practices, or for the state's failure to revoke a permit for a unit with possibly harmful environmental effects. 42 U.S.C. § 6945(d)(1)(B)(i)-(ii), (d)(1)(D)(ii)(I)–(III), (d)(1)(E). At least on its face, the statute contains no authorization for EPA to withdraw approval of a state program for non-compliance with a future regulation promulgated under EPA's public-participation provision authority. Indeed, plaintiffs seem to recognize the point in arguing the merits of their claim: they emphasize that, if EPA could satisfy its duty to adopt public-participation guidelines by promulgating regulations *after* approving a state permitting program, the guidelines would "have no practical effect." Plaintiffs' Br. 30 (citation omitted). Plaintiffs thus fail to show that granting relief on the citizen-suit claim would have any effect on the Oklahoma Program's public-participation rules, much less that granting relief would be substantially likely to affect those Oklahoma rules.

Plaintiffs observe in passing that we could order the agency to "ensure that Oklahoma's program meets [the new public participation] guidelines." Plaintiffs' Br. 24. Plaintiffs' requested relief, however, is confined to an order compelling EPA to promulgate a set of public-participation regulations (and that is seemingly all we could do in the circumstances per

terms of the citizen-suit provision, *see* 42 U.S.C. § 6972(a)). At any rate, plaintiffs do not identify a legal mechanism by which EPA could secure Oklahoma's compliance with public-participation guidelines the agency develops, much less the mechanism by which a court could require EPA to do so.

In theory, Oklahoma could voluntarily opt to conform to new public-participation guidelines adopted by EPA. But "standing to challenge a government policy cannot be founded merely on speculation as to what third parties will do in response to a favorable ruling." *Renal Physicians Ass'n*, 489 F.3d at 1274. And here, plaintiffs fall short of even speculation, as they do not purport to base redressability on Oklahoma's actions in response to EPA's prospective promulgation of new public-participation guidelines.

For those reasons, plaintiffs fail to show why compelling EPA to publish guidelines for public participation in state permitting programs would redress alleged injuries to their members from deficiencies in Oklahoma's program. They thus lack standing to bring the citizen-suit claim.

B.

We next examine plaintiffs' APA claims related to public participation: the guidelines claim and the Tier I claim. The guidelines claim asserts that EPA's approval of the Oklahoma Program was arbitrary and capricious because it took place before the Administrator promulgated public-participation guidelines for state programs. And the Tier I claim challenges EPA's approval on the ground that Oklahoma's permitting program affords inadequate public-participation opportunities for Tier I actions.

Plaintiffs allege the same injury in connection with those claims as with the citizen-suit claim: they contend that the

Oklahoma Program denies their members a meaningful opportunity to participate in permitting processes, exposing them to a greater risk of coal-ash pollution and its attendant consequences. Plaintiffs, though, seek a different type of relief under the APA claims—vacatur of EPA's approval of the Oklahoma Program (as opposed to an order compelling the Administrator to issue public-participation guidelines). Still, plaintiffs ultimately run into the same obstacle: they fail to show that their requested relief would redress their injuries.

The immediate effect of the requested relief—i.e., of vacating EPA's approval of the Oklahoma Program—would be to render Oklahoma a "nonparticipating state" under RCRA. 42 U.S.C. § 6945(d)(2)(A)(iv). If that were to happen, coal ash disposal units in Oklahoma would no longer be governed by the state permitting regime. Instead, they would be subject to the default federal regulatory regime. And at least as of now (before the promulgation of a federal permitting program, *id.* § 6945(d)(2)(B)), that default federal regime is the 2015 Rule.

Plaintiffs do not dispute, however, that the 2015 Rule affords *fewer* opportunities for public participation than the Oklahoma Program provides. *See* Intervenors' Br. 30–31. Under RCRA's framework, then, plaintiffs would have fewer opportunities for public participation if they prevailed on their claims than under the status quo. Far from affording them redress, plaintiffs' requested relief might exacerbate their alleged injuries.

At oral argument, plaintiffs sought to sketch out a more attenuated redressability theory. Under that theory, their injuries would be redressed not by the requested vacatur of EPA's approval itself, but instead by ensuing actions plaintiffs posit EPA would undertake. The chain of causation would run as follows: (i) in the course of vacating EPA's approval of the

Oklahoma Program, we would announce that the public-participation opportunities in the Oklahoma Program are deficient under RCRA's public-participation provision, 42 U.S.C. § 6974(b); (ii) EPA would account for that holding in developing a federal permitting program for coal ash facilities for nonparticipating states, *see id.* § 6945(d)(2)(B); (iii) EPA would thus establish a federal program with more robust public-participation opportunities than the Oklahoma Program affords; and (iv) because Oklahoma would become a nonparticipating state following our vacatur of EPA's approval, the new federal permitting program would go into effect in Oklahoma and would provide for increased public participation in permitting processes.

That newly fashioned theory of standing markedly differs from the theory espoused by plaintiffs in their briefing—the new theory turns on the potential implications of vacatur for a federal permitting program, whereas the redressability theory in plaintiffs' briefing turns on the implications of vacatur for Oklahoma's own permitting program. We decline to consider plaintiffs' new theory at this stage. *See Exxon Mobil Corp. v. FERC*, 571 F.3d 1208, 1220 (D.C. Cir. 2009). It bears noting, moreover, that in order to establish standing based on their newest theory, plaintiffs would need to show it is "substantially likely" that each link in their multi-step causal chain would come to fruition. *See Dellums v. U.S. Nuclear Reg. Comm'n*, 863 F.2d 968, 974 (D.C. Cir. 1988). But plaintiffs have made no effort to demonstrate, for instance, likely satisfaction of the condition that there be "appropriations specifically provided in an appropriations Act to carry out a [federal permitting] program in a nonparticipating state." 42 U.S.C. § 6945(d)(2)(B).

15

C.

We now consider plaintiffs' lifetime-permits claim. That claim argues that EPA's approval of a program allowing for lifetime permits conflicts with the statutory requirement that a state permitting program maintain standards at least as protective as the 2015 Rule and successor regulations. *See* 42 U.S.C. § 6945(d)(1)(B).

Plaintiffs fail to establish their standing to bring that claim because they fail to demonstrate imminent injury in connection with it. The nature of the injury supporting that claim is not entirely clear, but it seems to rely on the following causal chain: (i) the federal standards for coal ash disposal units (currently the 2015 Rule) will eventually be updated; (ii) one or more of those updates will render the federal standards more protective than whatever standards may be in effect in Oklahoma at the time; (iii) because Oklahoma issues lifetime permits untethered to changing federal standards, Oklahoma facilities will continue to operate under standards less protective than the federal ones; and (iv) Oklahoma disposal facilities then may dispose of coal ash in a less environmentally friendly way than federally regulated facilities.

The lifetime-permits claim thus is premised not on a present injury, but on the threat of a future one in the event the federal standards become stricter than Oklahoma's corresponding standards. Yet plaintiffs make no effort to show when that contingency might come to pass, much less that it will do so imminently. "'[S]ome day' intentions—without any description of concrete plans, or indeed even any specification of *when* the some day will be—do not support a finding of [] 'actual or imminent' injury." *Lujan*, 504 U.S. at 564. Plaintiffs thus fail to demonstrate standing for their lifetime permits claim.

16

D.

We last assess plaintiffs' standing to bring their two comments claims. Those claims assert that EPA's approval of the Oklahoma Program was arbitrary and capricious because the agency gave no adequate response to two of plaintiffs' comments on the proposed approval—one comment conveyed the substance of the guidelines claim, and the other related the substance of the lifetime permits claim.

To bring a claim stemming from the violation of a procedural right, a plaintiff "must allege injury beyond mere procedural misstep per se." *Ctr. for Law & Educ. v. Dep't of Educ.*, 396 F.3d 1152, 1160 (D.C. Cir. 2005). The plaintiff must also connect the procedural misstep to an agency action that caused the invasion of a concrete interest distinct from the procedural interest. *See id.* There are then "at least two links in an adequate causal chain between a procedural violation and injury-in-fact, one connecting the omitted procedure to some substantive government decision that may have been wrongly decided because of the lack of the procedure and one . . . showing that the particularized injury that the plaintiff is suffering . . . is fairly traceable to the agency action that implicated the procedural requirement in question." *City of Waukesha v. EPA*, 320 F.3d 228, 234 (D.C. Cir. 2003) (citations, brackets, and quotation marks omitted).

The first of those links is self-evident here. The omitted procedure (inadequate responses to two comments) is connected to a substantive government decision: EPA's final approval of the Oklahoma Program. But plaintiffs fail to demonstrate the second link. Recall that plaintiffs allege their members suffer two particularized injuries traceable to EPA's approval: first, injuries due to inadequate public-participation opportunities in certain permitting actions, and second, injuries

due to Oklahoma's issuance of lifetime permits. Neither set of injuries confers standing to bring the comment claims. The first is not traceable to EPA's approval of the Oklahoma Program, and the second is not imminent.

With respect to the first type of injury, we have already explained why it would not be redressed by vacatur of EPA's approval of the Oklahoma Program. It follows that any participation-related injuries are not traceable to EPA's approval of the Oklahoma program. Before EPA's approval of the Oklahoma Program, Oklahoma was subject to the federal default regulatory regime—i.e., the 2015 Rule. And plaintiffs concede that the 2015 Rule affords fewer public-participation opportunities than the Oklahoma Program. So, if anything, EPA's approval of the Oklahoma Program *increased* plaintiffs' members' opportunities to participate in local decisions involving coal ash disposal. Plaintiffs' participation-related injury, then, is not "traceable to" EPA's approval, "the agency action that implicated the procedural requirement in question." *Waukesha*, 320 F.3d at 234 (quotation marks omitted).

Plaintiffs' second set of alleged injuries—those stemming from the issuance of lifetime permits under the Oklahoma Program—is traceable to EPA's approval of that program. But as we have explained, plaintiffs have not shown that applicable federal standards are imminently likely to become more protective than Oklahoma's standards. And that contingency is a necessary precondition to demonstrating imminent injury to plaintiffs' members from Oklahoma's issuance of lifetime permits (and EPA's approval of that practice). Just as with the other comment claim, then, plaintiffs lack standing to challenge EPA's ostensibly inadequate response to the comment for substantially the same reason they lack standing to challenge the underlying substantive deficiency the comment identified.

18

\* \* \* \* \*

For the foregoing reasons, the district court's grant of summary judgment to EPA is vacated, and the case is remanded with instructions to dismiss the relevant parts of the complaint for lack of jurisdiction.

*So ordered.*